KAREN M. GOODMAN, SBN: 117423
SUMMER D. HARO, SBN: 245482
GOODMAN & ASSOCIATES
3840 Watt Avenue – Bldg. A
Sacramento, CA 95821-2640
Telephone No:  (916) 643-0600
Facsimile No:    (916) 643-0605
kgoodman@goodman-law.com
suharo@goodman-law.com

Attorney for Plaintiff Rakesh Joshi and Pranika Joshi

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAKESH JOSHI and PRANIKA JOSHI,<br><br>         Plaintiffs,<br><br>   vs.<br><br>STARBUCKS CORPORATION, a Washington Corporation, and Does 1 through 10 inclusive,<br><br>         Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES WITH REQUEST FOR JURY TRIAL**<br><br>1. **Breach of Contract**<br>2. **Breach of the Implied Covenant of Good Faith and Fair Dealing**<br>3. **Promissory Fraud** |

PLAINTIFFS Rakesh Joshi and Pranika Joshi ("PLAINTIFFS") for their Complaint against DEFENDANT Starbucks Corporation ("DEFENDANT"), allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C §1332, because PLAINTIFFS and DEFENDANT are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.      Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §1391(a)(2), because a substantial part of the events or omissions giving rise to the claims occurred within the Eastern District of California.

//

/

Dockets.Justia.com

## THE PARTIES

3.    PLAINTIFFS are individuals and husband and wife who are domiciled in the state of California and residing in Chico, California.  PLAINTIFFS own the real property located at 14 West Eaton Road, Chico, California, 95973 ("the Property"), which is at the corner of the intersection of Eaton Road and The Esplanade in Chico, California.

4.    PLAINTIFFS are informed and believe that DEFENDANT is a Washington corporation organized and existing under the laws of the State of Washington, whose principal place of business is located in Seattle, Washington.  DEFENDANT is an internationally recognized corporation that owns and operates coffee shop franchises.

5.    PLAINTIFFS are ignorant of the true names and capacities of the Defendants used herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.  PLAINTIFFS will amend this complaint to allege their true names and capacities when ascertained.  PLAINTIFFS are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the losses referenced herein.  Whenever and wherever a charging allegation is made against any Defendant, either as a Doe or a named Defendant, said charging allegations shall be deemed to apply to each and every Doe Defendant.

6.    PLAINTIFFS are informed and believe and thereon allege that at all times herein mentioned each of the Defendants was the agent, servant, independent contractor, partner, alter ego, successor and/or employee of each of the remaining Defendants and was acting within the scope of their authority and with the permission, consent and ratification of said co-defendants at all times relevant to the allegations of this complaint.

## GENERAL ALLEGATIONS

7.    In or about June 2007, PLAINTIFFS and DEFENDANT entered into negotiations for DEFENDANT to lease a portion of a retail building complex to be constructed by PLAINTIFFS on the Property consistent with DEFENDANT'S

specifications. DEFENDANT was to open a coffee shop, using its internationally recognized name, trademark and business reputation, to be the anchor store in that complex, and required that PLAINTIFFS construct the building complex with a drive-through specifically designed for DEFENDANT'S store.

8.     In or about February 2008, PLAINTIFFS and DEFENDANT entered into a written lease agreement, pursuant to their negotiations which began in or about June 2007 (referred to as "the Lease"). In that agreement, PLAINTIFFS agreed to build the retail complex, with the anchor store portion, consisting of approximately 1,700 square feet, to be designed consistent with DEFENDANT'S specifications, and subject to DEFENDANT'S approval, and with a drive-through area for DEFENDANT'S store, also designed consistent with DEFENDANT'S specifications. The Lease provided that DEFENDANT would lease the anchor store from PLAINTIFFS for an initial period of 10 years, beginning when PLAINTIFFS completed construction of the complex and delivered possession to DEFENDANT, but no earlier than October 1, 2008, the "Scheduled Delivery Date" of the store to DEFENDANT. The Lease further provided that DEFENDANT would pay PLAINTIFFS an annual Base Rent as follows: an annual rent of $76,500.00 for the first 5 years of the initial lease term and an annual rent of $84,252.00 for the last 5 years of the initial lease term, for a total of **$803,760.00,** in addition to its proportional share of Common Area Maintenance charges in an amount to be determined.

9.     The Lease further contained an "Exclusivity" Clause which prohibited PLAINTIFFS from leasing any other portion of the complex to any person or entity, other than a full-service, sit-down restaurant, who would sell coffee beans, coffee drinks, tea or tea-based drinks, or blended beverages. The Lease further provided that the Lease would be governed by the laws of the State of California, where the Property is located, and that in the event of a dispute between the parties regarding the Lease that the prevailing party shall be entitled to reasonable attorneys' fees.

10.     In reliance on DEFENDANT'S agreement to open and operate one of its

franchises on the Property, pursuant to the Lease terms, PLAINTIFFS acquired financing from Community First Bank, in the amount of approximately $1,500,000.00, for the construction of the building complex. PLAINTIFFS would not have sought such financing if DEFENDANT had not agreed to the Lease, or if they knew that DEFENDANT would not comply with its obligations under the Lease. Further, PLAINTIFFS are informed and believe that the construction loan was issued by Community First Bank because DEFENDANT had entered into the Lease with PLAINTIFFS. PLAINTIFFS are further informed and believe that Community First Bank would not have issued the construction loan to PLAINTIFFS if DEFENDANT had not entered into the Lease for the Property. At the time the construction loan was issued, the Property was valued at approximately $2.9 million.

11.     Pursuant to the Lease, and in relying on DEFENDANT to comply with its obligations under the Lease, PLAINTIFFS incurred substantial expenses employing architects and designers to develop and secure approval of plans for the retail building complex, based on DEFENDANT'S specifications, and began construction of the complex on the Property. DEFENDANT was responsible for preparing and submitting architectural plans to secure the proper building permits for the interior fixtures and design of the 1,700 square foot space it was leasing on the Property. In March 2008, Steven Hall, representing DEFENDANT, informed PLAINTIFFS, via e-mail, that the permit for the Property's interior plans would be due on July 11, 2008. In April 2008, PLAINTIFFS sent an e-mail to Steven Hall, asking whether those interior plans had been submitted to the City of Chico yet. Mr. Hall responded, via e-mail, by representing to PLAINTIFFS that the estimated submittal date for the plans would be May 2, 2008. In May 2008, PLAINTIFFS contacted another of DEFENDANT'S representatives, Serene Smart, via e-mail, to clarify when DEFENDANT'S interior plans would actually be submitted to the City of Chico for approval, since they had not yet received a firm date from any of DEFENDANT'S representatives. Ms. Smart's response, also sent via e-mail, was that DEFENDANT'S design team had been "pulled in different directions" in

the last few months and that they were covering "different responsibilities." On or about June 10, 2008, PLAINTIFFS spoke on the phone with Mr. Chan who, for the first time, told PLAINTIFFS that DEFENDANT was waiting to submit its plans until it had information on what Wal-Mart was doing. Wal-Mart was not involved in any of the lease negotiations between the parties, and was not located in PLAINTIFFS' business complex. Confused and concerned by this new representation and delay, on that same day PLAINTIFFS sent Mr. Chan an e-mail asking Mr. Chan to confirm that DEFENDANT'S interior plans were complete. The next day, PLAINTIFFS were contacted via e-mail by Leslie Mitchell, another of DEFENDANT'S representatives, who represented to PLAINTIFFS that there was a delay in submitting its plans only because DEFENDANT'S design group needed to review every floor plan to add or delete different design elements. Ms. Mitchell further represented in her e-mail that DEFENDANT'S new Director would visit the Property the following week to visit the Property, and that Ms. Mitchell would provide PLAINTIFFS with an update on the plan submission after that visit.

12. On or about June 18, 2008, after DEFENDANT'S Director inspected the Property, PLAINTIFFS sent Ms. Mitchell a follow-up e-mail asking for information on submitting DEFENDANT'S plans. On or about June 20, 2008, Ms. Mitchell responded via e-mail, and represented, for the first time that DEFENDANT had decided the site was very "green" for its current business plans. In that e-mail, Ms. Mitchell acknowledged that DEFENDANT had a signed lease agreement with PLAINTIFFS, but unequivocally stated that DEFENDANT "will not be moving forward with occupying the space and will not be submitting our building permit plans."

13. On or about July 8, 2008, DEFENDANT sent PLAINTIFFS a letter, through DEFENDANT'S corporate counsel, again acknowledging the existence of the Lease and unequivocally informing PLAINTIFFS that DEFENDANT "does not intend to open a store in this location." On or about December 2, 2008, DEFENDANT'S representative, Jeremy Hudson, sent an e-mail to PLAINTIFFS' representative admitting

that DEFENDANT'S "decision not to open at this location and therefore not pay rent constitutes a default under the Lease."

14. PLAINTIFFS acquired the construction loan and became liable for a $1.5 million promissory note which encumbered the property and built the business complex on the Property, pursuant to DEFENDANT'S specifications, in reliance on DEFENDANT'S representations and obligations to occupy the Property as a tenant, in the anchor-store location, for at least 10 years, and to pay rent pursuant to the terms of the Lease. If PLAINTIFFS had known that DEFENDANT was not going to open its store on the Property, PLAINTIFFS would not have encumbered the property, become liable for the construction loan and built the business complex in 2008. Additionally, because DEFENDANT repeatedly represented to PLAINTIFFS throughout the spring of 2008, that DEFENDANT planned on honoring the Lease, and was in the process of submitting its plans for permits, with a few possible additions/deletions to floor plans, in reliance on these representations, PLAINTIFFS refrained, to their detriment, from leasing any space in the complex to anyone who would sell coffee, tea or blended beverages, since the Lease prohibited them from doing so. Further, in reliance on the Lease and DEFENDANT'S representations that it would occupy the anchor store location in the business complex, PLAINTIFFS informed other potential tenants that DEFENDANT would be the anchor-store for at least 10 years. PLAINTIFFS are informed and believe that the other tenants who agreed to lease portions of the business complex did so because DEFENDANT had entered into the Lease with PLAINTIFFS to be the anchor store at that complex. Since DEFENDANT repudiated its obligations under the Lease, and has refused to open its store on the Property, other tenants, and potential tenants, for the Property terminated their leases and/or lease negotiations with PLAINTIFFS. PLAINTIFFS are informed and believe that those tenants cancelled their leases and/or terminated lease negotiations with PLAINTIFFS because DEFENDANT was no longer the anchor-store for the business complex.

//

# FIRST CLAIM FOR RELIEF

## (Breach of Contract)

15.     PLAINTIFFS incorporate by reference paragraphs 1 through 14 as though fully set forth herein.

16.     On or about February 2008, DEFENDANT entered into a written lease agreement, wherein DEFENDANT agreed to lease and occupy 1,700 square feet of the Property from PLAINTIFFS for at least 10 years, and to pay PLAINTIFFS rent as set forth in the Lease, totaling approximately $803,760.00 plus a proportional share of Common Area Maintenance expenses.  In exchange, PLAINTIFFS agreed to build a structure on the Property conforming to DEFENDANT'S specifications, including the addition of a drive-through space, and to lease 1,700 square feet of the Property to DEFENDANT for at least 10 years.

17.     At considerable expense, PLAINTIFFS have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Lease.

18.     DEFENDANT breached the Lease by refusing to occupy the 1,700 square feet of the Property for 10 years and refusing to pay PLAINTIFFS the rent specified in the Lease.

19.     As a direct and proximate result of DEFENDANT'S breach, PLAINTIFFS have suffered, and will suffer, damages in excess of $1.5 Million Dollars, including the obligation for future rents, the debt through the construction loan, lost profits, and diminution in value, in an amount to be proven at trial.

20.     PLAINTIFFS have incurred attorneys' fees to enforce the lease agreement with DEFENDANT and are entitled to attorneys' fees according to proof.

## SECOND CLAIM FOR RELIEF

## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

21.     PLAINTIFFS incorporate by reference paragraphs 1 through 20 as though fully set forth herein.

22.    DEFENDANT breached its duty of good faith and fair dealing owed to PLAINTIFFS by:

(a)    Concealing from PLAINTIFFS from February 2008, through June 2008, that DEFENDANT did not intend to honor its obligations under the Lease;

(b)    Misrepresenting to PLAINTIFFS from at least April 2008, through June 2008, that DEFENDANT intended to submit its plans for permits to the City of Chico for approval, and that it was only delayed in doing so because its design team was otherwise occupied and/or needed to consider  possible additions/deletions to the plans;

(c)    Misrepresenting to PLAINTIFFS that DEFENDANT'S delays in occupying the Property were only because of delays in submitting its plans for permits to the City of Chico for approval;

(d)    Misstating and misrepresenting essential terms of the contract;

(e)    Failing to make payments due under the Lease;

(d)    Unfairly interfering with PLAINTIFFS' right to receive benefits under the Lease;

(e)    Failing to cooperate with PLAINTIFFS in the performance of the Lease;

(f)    Other acts demonstrating bad faith.

23.    PLAINTIFFS are informed and believe, and thereon allege, that DEFENDANT has breached its duty of good faith and fair dealing owed to PLAINTIFFS by other acts and omissions of which Plaintiff is presently unaware.

24.    As a direct and proximate result of DEFENDANT'S breach, PLAINTIFFS have suffered, and will suffer, damages totaling more than $1.5 Million Dollars, including the obligation for future rents, the debt through the construction loan,  lost profits, and diminution in value, in an amount to be proven at trial.

/ /

/

## THIRD CLAIM FOR RELIEF

### (Promissory Fraud)

25.    PLAINTIFFS incorporate by reference paragraphs 1 through 24 as though fully set forth herein.

26.    From February 2008, through June 2008, DEFENDANT repeatedly promised verbally and in writing that it would comply with their obligations under the Lease, open and operate one of DEFENDANT'S coffee shops pursuant to the Lease, make all rental payments pursuant to the Lease, and that it would submit its building plans to the City of Chico for approval so that it could open and operate one of its coffee shops pursuant to the Lease.

27.    DEFENDANT'S repeated promises were important to the transaction because PLAINTIFFS obtained a construction loan, became personally liable for the loan and encumbered the property, incurred expenses for designing and building the retail building complex in conformity with DEFENDANT'S specifications, and refrained from leasing other portions of the complex to any tenants who would sell coffee, tea or blended beverages, in reliance on DEFENDANT'S repeated promises of performance.

28.    DEFENDANT intended that PLAINTIFFS rely on these verbal and written promises in inducing PLAINTIFFS to enter into the Lease, and construct the building complex in conformity with DEFENDANT'S specifications so that DEFENDANT could have the option of using the complex without incurring the expense, or bearing the risk of constructing the buildings itself, and instead inducing PLAINTIFFS to solely incur those expenses and bear the risk of constructing the buildings, to PLAINTIFFS' detriment.

29.    PLAINTIFFS reasonably relied on DEFENDANT'S repeated promises to their detriment because PLAINTIFFS secured and became liable for a construction loan, incurred expenses for designing and building the retail building complex in conformity with DEFENDANT'S specifications, and, pursuant to the Lease, refrained from leasing any portion of the complex to any other tenants who would sell coffee, tea

or blended beverages, without knowing that in fact DEFENDANT had no intention of complying with its obligations under the Lease.

30.    At the time DEFENDANT made its promises to PLAINTIFFS, which PLAINTIFFS reasonably relied on, DEFENDANT had no intention of fulfilling those promises.

31.    DEFENDANT did not perform any of its promised acts, in that it did not perform its obligations under the Lease, did not open and operate one of its coffee shops pursuant to the Lease, did not make any rental payments to PLAINTIFFS pursuant to the Lease, and did not submit its building plans to the City of Chico for approval.

32.    As a direct and proximate result of DEFENDANT'S fraud, and the resulting reasonable reliance by PLAINTIFFS, PLAINTIFFS were harmed in that they became liable for a construction loan which encumbered the Property, were prevented from developing the Property for another use, were forced to design the building complex in conformity with DEFENDANT'S specifications for DEFENDANT'S particular use, lost at least 10 years-worth of rent due under the Lease amounting to at least $803,760.00, and lost substantial rental income and profits because they were unable to lease building space to any other tenants who would sell coffee, tea or blended beverages, thus, PLAINTIFFS have suffered, and will suffer, damages totaling more than $1,500,000.00, in an amount to be proven at trial.

33.    PLAINTIFFS allege that DEFENDANT'S fraudulent promise without intention to perform was egregious and deliberate and entitles PLAINTIFFS to recover punitive damages as a means of making an example of DEFENDANT and to deter future egregious conduct.

## **PRAYER**

WHEREFORE, PLAINTIFFS pray for judgment in their favor and against DEFENDANT as follows:

1.    For general and consequential damages according to proof;

2. For special damages, late fees, interest and penalties as provided in the Agreement;

3. For costs and prejudgment interest as allowed by law;

4. For reasonable attorneys' fees and expenses pursuant to contract;

5. Exemplary damages according to proof; and

6. For such other and further relief as the Court may deem just and equitable.

7. A demand for a jury trial.


DATED: January 8, 2009                          **GOODMAN & ASSOCIATES**

By: _____
KAREN M. GOODMAN,
SUMMER D. HARO, Attorneys for
PLAINTIFFS RAKESH JOSHI and
PRANIKA JOSHI

**EXHIBIT A**

# COMMERCIAL LEASE

## EATON ROAD & THE ESPLANADE

## CHICO, CALIFORNIA

between

### RAKESH JOSHI and PRANIKA JOSHI

and

### STARBUCKS CORPORATION

STARBUCKS

# TABLE OF CONTENTS

**Page**

1.  PREMISES ............................................................................................................. 1
2.  TERM ................................................................................................................... 1
    2.1  Term ......................................................................................................... 1
    2.2  Delivery .................................................................................................... 1
    2.3  Lease Year ............................................................................................... 2
    2.4  Extension ................................................................................................. 2
3.  RENT ................................................................................................................... 2
4.  CONDITION OF THE PREMISES, POSSESSION AND TENANT ALLOWANCE ..................... 3
    4.1  Condition of the Premises ........................................................................ 3
    4.2  Landlord's Obligations ............................................................................. 3
    4.3  Delay in Delivery of Possession .............................................................. 4
    4.4  Tenant Allowance .................................................................................... 4
    4.5  Independent Measurement of Premises .................................................. 5
    4.6  Landlord's Building Plans ........................................................................ 5
5.  USE .................................................................................................................... 5
    5.1  Use .......................................................................................................... 5
    5.2  Compliance with Law ............................................................................... 5
    5.3  Operations ............................................................................................... 5
    5.4  Exclusivity ............................................................................................... 6
    5.5  New Construction Contingency ................................................................ 6
6.  MAINTENANCE, REPAIRS, AND ALTERATIONS .......................................................... 6
    6.1  Tenant's Obligations ................................................................................ 6
    6.2  Landlord's Obligations ............................................................................. 6
    6.3  Surrender ................................................................................................. 7
    6.4  Landlord's Rights ..................................................................................... 7
    6.5  Alterations and Additions ........................................................................ 7
    6.6  Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings ......... 8
7.  INSURANCE; INDEMNITY ....................................................................................... 8
    7.1  Tenant's Insurance ................................................................................... 8
    7.2  Landlord's Insurance ............................................................................... 8
    7.3  Waiver of Subrogation ............................................................................. 9
    7.4  Indemnification by Tenant ........................................................................ 9
    7.5  Indemnification by Landlord ..................................................................... 9
8.  ENVIRONMENTAL LIABILITY .................................................................................. 10
    8.1  Environmental Law .................................................................................. 10

| | 8.2 | Hazardous Substance | 10 |
| | 8.3 | Landlord's Covenants | 10 |
| | 8.4 | Tenant's Use of any Hazardous Substance | 11 |
| | 8.5 | Indemnities | 11 |
| 9. | | DAMAGE OR DESTRUCTION | 12 |
| | 9.1 | Material Damage | 12 |
| | 9.2 | Repair After Damage | 12 |
| | 9.3 | Uninsured Damage | 12 |
| | 9.4 | Damage During Final Two Years | 12 |
| | 9.5 | Abatement of Rent | 12 |
| 10. | | PROPERTY TAXES | 12 |
| | 10.1 | Definition of "Real Property Taxes" | 12 |
| | 10.2 | Payment of Real Property Taxes | 13 |
| | 10.3 | Personal Property Taxes | 13 |
| | 10.4 | Property Tax Protection | 13 |
| 11. | | UTILITIES | 13 |
| 12. | | TENANT'S PRO RATA SHARE OF COMMON AREA OPERATING EXPENSES, INSURANCE AND TAXES | 14 |
| | 12.1 | General Definitions | 14 |
| | 12.2 | Definition of Tenant's Pro Rata Share | 14 |
| | 12.3 | Tenant's Payment | 14 |
| | 12.4 | Reconciliation | 15 |
| | 12.5 | Exclusions from Operating Expenses | 15 |
| | 12.6 | Records | 15 |
| | 12.7 | Dispute Resolution | 16 |
| 13. | | ASSIGNMENT AND SUBLETTING | 16 |
| 14. | | DEFAULTS; REMEDIES | 16 |
| | 14.1 | Tenant's Defaults | 16 |
| | 14.2 | Remedies in Default | 16 |
| | 14.3 | Landlord Default and Remedies | 17 |
| 15. | | CONDEMNATION | 17 |
| | 15.1 | Condemnation of Premises | 17 |
| | 15.2 | Condemnation of the Property | 17 |
| | 15.3 | Condemnation of the Shopping Center | 18 |
| | 15.4 | Restoration | 18 |
| | 15.5 | Award | 18 |
| 16. | | SIGNAGE | 18 |

17. PERMIT CONTINGENCY ............................................................................................ 19
18. OUTDOOR SEATING AREA AND DRIVE-THROUGH FACILITY ......................................... 19
    18.1    Outdoor Seating Area ......................................................................................... 19
    18.2    Drive-Through Facility ......................................................................................... 19
19. TENANT'S RIGHT OF EARLY TERMINATION ............................................................... 19
20. TENANT'S USE OF COMMON AREAS .......................................................................... 19
21. PARKING AND ACCESS ............................................................................................ 20
22. TRASH REMOVAL .................................................................................................... 20
23. GENERAL PROVISIONS ............................................................................................ 20
    23.1    Estoppel Certificate ............................................................................................ 20
    23.2    Landlord's Interests ............................................................................................ 21
    23.3    Authority ............................................................................................................. 21
    23.4    Severability ......................................................................................................... 21
    23.5    Time of Essence ................................................................................................. 21
    23.6    Interpretation ...................................................................................................... 21
    23.7    Incorporation of Prior Agreements; Amendments ................................................ 21
    23.8    Waivers .............................................................................................................. 21
    23.9    Recording .......................................................................................................... 22
    23.10  Holding Over ...................................................................................................... 22
    23.11  Cumulative Remedies ........................................................................................ 22
    23.12  Binding Effect; Choice of Law ............................................................................ 22
    23.13  Subordination, Nondisturbance and Attornment ................................................. 22
    23.14  Landlord's Access ............................................................................................. 22
    23.15  Only Landlord/Tenant Relationship .................................................................... 22
    23.16  Attorney's Fees ................................................................................................. 23
    23.17  Force Majeure ................................................................................................... 23
    23.18  Confidentiality of Lease ..................................................................................... 23
    23.19  Brokers ............................................................................................................. 23
    23.20  Consents ........................................................................................................... 24
    23.21  Waiver of Jury Trial ........................................................................................... 24
    23.22  Other Stores ...................................................................................................... 24
24. QUIET ENJOYMENT ................................................................................................. 24
25. NOTICES ................................................................................................................ 24
26. EXHIBITS ................................................................................................................ 25

# COMMERCIAL LEASE
## (Multi-Tenant Shopping Center w/Drive-Through)

THIS COMMERCIAL LEASE (the "Lease"), is made and entered into as of February _____, 2008 by and between Rakesh Joshi and Pranika Joshi, husband and wife, as joint tenants ("Landlord"), and Starbucks Corporation, a Washington corporation ("Tenant").

1.    <u>PREMISES</u>. Landlord will be the owner of a building that will be constructed and located at the intersection of Eaton Road and The Esplanade in Chico, California (the "Building") in a shopping center (the "Shopping Center") and situated upon the real property legally described in <u>Exhibit A</u> attached hereto and by this reference incorporated herein (the "Property"). In consideration of the mutual promises, covenants and conditions herein set forth, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, for the Term of this Lease those certain premises in the Building with an address of 14 West Eaton Road, Chico, California 95973, containing approximately one thousand seven hundred (1,700) square feet of Gross Leasable Area (as defined below) as shown by cross-hatching on <u>Exhibit B</u> attached hereto and by this reference incorporated herein (the "Premises"). The Building will also include a tower element. In addition, Tenant shall have the right to operate a drive-through facility containing one (1) drive-through lane as shown on <u>Exhibit B</u>. For purposes of this Lease, "Gross Leasable Area" means the number of gross square feet of leasable floor area (regardless of whether such area is occupied or enclosed) intended primarily for the exclusive use by an occupant for any length of time, including without limitation garden centers used for the sale and display of merchandise and storage space within or immediately adjacent to an occupant's premises, but excluding any Shopping Center management office, Common Area (as defined in Section 12.1 below) maintenance storage areas, and Common Area community room. The Gross Leasable Area of any premises (including the Premises) shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of the such premises where it abuts the sidewalk or other Common Area (which line is commonly known as the "lease line"), and the center line of any wall that such premises shares with other leasable areas of the Shopping Center.

2.    <u>TERM</u>.

   2.1    <u>Term</u>. The "Initial Term" shall mean ten (10) Lease Years, commencing on the Rent Commencement Date (as defined in Article 3 below), and ending on the last day of the tenth (10th) Lease Year, unless sooner terminated or extended as provided herein. For purposes of this Lease, the word "Term" shall mean the Initial Term and any Extension Term (as defined in Section 2.4.1 below) and the "Expiration Date" shall mean the last day of the last Lease Year of the Term. Promptly after the Rent Commencement Date, Landlord and Tenant shall execute a certificate in the form of <u>Exhibit F</u> stating the actual Commencement Date (as defined in Section 2.2. below), Rent Commencement Date and Expiration Date. Landlord's failure or refusal to execute and deliver such certificate to Tenant within thirty (30) days after receipt thereof shall constitute an acknowledgment by Landlord that the factual statements contained therein are true and correct without exception, and may be relied upon by Tenant.

   2.2    <u>Delivery</u>. The "Commencement Date" shall mean the date on which all of the following conditions have been satisfied or waived by Tenant in writing:

       (a)    Landlord has completed Landlord's Work (as defined in Section 4.2);

       (b)    Landlord has delivered actual possession and control of the Premises to Tenant;

       (c)    Landlord and Tenant have executed and delivered a written notice of delivery and acceptance of the Premises in the form attached hereto as <u>Exhibit D</u>;

Eaton Road & Esplanade
Chico, CA
3150870.6

1

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

(d)    Tenant has received all Government Approvals (as defined in Article 17 below);

(e)    Landlord has delivered a fully executed copy of this Lease to Tenant;

(f)    Landlord has abated all Hazardous Substances, if any, from the Property and Premises and provided evidence thereof from the applicable government agency or certified environmental consultant; and

(g)    Landlord has completed the Common Areas and all improvements thereto, including without limitation the grading and surfacing of all parking lots, driveways and sidewalks serving the Shopping Center and the installation of all parking lot lighting and landscaping.

Notwithstanding the foregoing, in no event shall the Commencement Date occur prior to October 1, 2008 (the "Scheduled Delivery Date"). Landlord and Tenant acknowledge that the Premises may be ready for occupancy prior to the Scheduled Delivery Date and agree that Tenant, in its sole discretion, may accept possession of the Premises on or before the Scheduled Delivery Date so long as Landlord provides ninety (90) days prior written notice to Tenant of the anticipated date that the Premises will be ready for occupancy and Tenant has received all Government Approvals; provided, however, that in no event shall Tenant be required to accept possession of the Premises prior to August 15, 2008.

2.3    Lease Year. For the purpose of this Lease, subject to the two additional provisions set forth below in this Section 2.3, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12) consecutive calendar months during the Term. If the Term commences on a day other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding twelve (12) full calendar months shall constitute the first Lease Year of the Term. If the last day of the first Lease Year falls between September 1 and January 31, then the first Lease Year shall be extended to end on the last day in February and each subsequent Lease Year shall begin on March 1.

2.4    Extension.

2.4.1    Tenant shall have the option to extend the Term of this Lease for four (4) consecutive five (5) year period(s) (each an "Extension Term"), upon the same terms and conditions as contained in this Lease. The Base Rent for each Extension Term shall be as set forth in Article 3 below. To exercise an extension option, Tenant shall give Landlord notice ("Tenant's Extension Notice") at least one hundred eighty (180) days prior to the then-current Expiration Date ("Tenant's Extension Deadline"). Tenant's Extension Notice shall be effective to extend the Term of this Lease without further documentation except as expressly provided in Section 2.4.2 below.

2.4.2    At any time after Tenant has exercised its option to extend the Term of this Lease, Landlord and Tenant, upon request of either, will sign, acknowledge and deliver a written memorandum evidencing Tenant's exercise of the option and stating the date to which such Extension Term will extend and the rental rates that will be applicable during such Extension Term.

3.    RENT. Tenant shall pay to Landlord at the address stated herein, or to such other person or at such other place as Landlord may designate in writing, rent as follows ("Base Rent"):

| Lease Years | $ Per Square Foot Per Month | Monthly Installment | Annual Rent |
|---|---|---|---|
| 1-5 | $3.75 | $ 6,375.00 | $ 76,500.00 |
| 6-10 | $4.13 | $ 7,021.00 | $ 84,252.00 |
| Extension Terms | | | |
| 11-15 | $4.54 | $ 7,718.00 | $ 92,616.00 |

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

| 16-20 | $4.99 | $ 8,483.00 | $101,796.00 |
| 21-25 | $5.49 | $ 9,333.00 | $111,996.00 |
| 26-30 | $6.04 | $10,268.00 | $123,216.00 |

Tenant shall commence to pay Base Rent and all other charges hereunder on the date (the "Rent Commencement Date") that is the later of (a) one hundred twenty (120) days after the Commencement Date or (b) the date Tenant opens to the general public for business in the Premises. Tenant shall continue to pay Base Rent in monthly installments on or before the first day of every month thereafter during the Term. Rent for any period during the Term less than one calendar month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year. Notwithstanding the foregoing, Tenant shall not be required to pay Base Rent or any other charges hereunder until Tenant receives from Landlord a completed and executed W-9 taxpayer identification form and a copy of Landlord's most recent tax bill for the Property. Other than paying Base Rent and the other charges expressly provided elsewhere in this Lease, Tenant has no obligation to pay Landlord any other amounts.

4. **CONDITION OF THE PREMISES, POSSESSION AND TENANT ALLOWANCE.**

4.1 <u>Condition of the Premises</u>. Landlord shall cause the Property, including the Premises, Building, drive-through lane and parking spaces, to be designed and constructed substantially as shown on **Exhibits B** and **G**. Landlord represents and warrants that, as of the Commencement Date, Landlord's Work, the Common Areas and all parts of the Premises and the Shopping Center including, without limitation, sidewalks, parking areas, driveways, all structural elements, the foundation, roof, roof membrane and roof system, exterior walls, plumbing, electrical and other mechanical systems (a) are complete and comply with all federal, state, and local laws, codes, rules and regulations including, without limitation, all handicapped accessibility standards, such as those promulgated under the Americans With Disabilities Act ("ADA"), and (b) are seismically and otherwise sound and in good, workable and sanitary order, condition, and repair at the time of delivery of the Premises to Tenant. Landlord shall correct any latent defects promptly after Tenant notifies Landlord of any such defect. Landlord represents and warrants that it has disclosed to Tenant any conditions or restrictions, including, without limitation, environmental contamination, restrictions on utilities or exclusive use restrictions within Landlord's knowledge that would adversely affect Tenant's store design, permitting, construction or use as contemplated by this Lease.

4.2 <u>Landlord's Obligations</u>. At no cost to Tenant, Landlord shall provide to Tenant final plans of the Premises and Shopping Center that have been approved by all applicable government entities in an industry standard electronic or digital format. Landlord shall complete all items described on **Exhibit C** attached hereto and by this reference incorporated herein, and any work necessary to bring the Premises and the Shopping Center into the condition required under Section 4.1 (collectively, "Landlord's Work") at its sole cost and expense in a good and workmanlike manner before delivering the Premises to Tenant. Landlord's Work shall also include obtaining all approvals to finalize a master sign program (if required or necessary) acceptable to Tenant by the date that Landlord delivers its plans to Tenant and in any event no later than ninety (90) days before the Scheduled Delivery Date. Landlord's Work shall also include obtaining all permits and/or government approvals for the construction and operation of Tenant's drive-through facility as described on **Exhibits B** and **C**. At least ninety (90) days prior to the Scheduled Delivery Date, Landlord shall provide Tenant a written copy of Landlord's construction schedule. Landlord shall notify Tenant in writing at least ten (10) days prior to the date that Landlord anticipates that the Premises will be ready for Tenant's occupancy and Tenant shall arrange promptly to inspect the Premises. At the time of Tenant's inspection, Landlord shall demonstrate all of Landlord's Work, including (without limitation) the matters identified in Section 4.1, such as the legal compliance, working order, condition and repair of all mechanical, electrical and other Building-wide systems serving the Premises. Tenant shall deliver to Landlord a written punch list of all incomplete or faulty items of construction or mechanical installation, and any necessary mechanical adjustments and finish work needed to bring the Premises and the Shopping Center into the condition required under this Article.

If the Premises are in the condition required under this Article on the Scheduled Delivery Date but subject only to minor punch list items, Tenant may, at its option, (i) require Landlord to repair all punch list

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

items prior to Tenant's acceptance of the Premises, or (ii) accept delivery of the Premises and require Landlord to complete the punch list items within fourteen (14) days after the date Tenant accepts the Premises. If the Premises are not in the condition required under this Article on the Scheduled Delivery Date then Tenant may, at its option, either (a) delay acceptance of possession until the Premises are in the condition required under this Article and pursue its remedies under Section 4.3; or (b) accept possession of the Premises and complete all work necessary to bring the Premises into the required condition. If Tenant elects to proceed under the foregoing subsection (a), Tenant may enter the Premises to perform Tenant's work (at Tenant's cost and expense) without prejudicing Tenant's rights and remedies under Section 4.3. If Tenant elects to proceed under the foregoing subsection (b), then Landlord shall reimburse Tenant for the actual cost of such work and any additional amounts Landlord agreed to pay Tenant pursuant to other written agreements such as the Landlord Work Modification Letter attached hereto as **Exhibit E**, plus an administrative surcharge of fifteen percent (15%) to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums. Tenant's and its contractor's determination of the cost of such work shall be final and binding on Landlord and Landlord acknowledges that Landlord can control the cost by performing the work under this Article in a timely manner. If Landlord does not reimburse Tenant as required by this Section, then Tenant may offset such sum against Base Rent and all other charges until such sum has been fully recouped.

4.3     Delay in Delivery of Possession. Landlord shall satisfy all conditions listed in Section 2.2 (a) through (g) above on or before the Scheduled Delivery Date. Landlord acknowledges that Tenant intends to start construction of Tenant's improvements on the Scheduled Delivery Date, and that a delay beyond such date will cause Tenant to suffer certain losses which are difficult to quantify including, by way of illustration and not of limitation, lost profits, construction delay costs and employee wages. If the Commencement Date does not occur within fourteen (14) days of the Scheduled Delivery Date for any reason (regardless of the fact that Tenant may have elected to enter the Premises to perform Tenant's work prior to Landlord's Work being completed), then Tenant shall be entitled to two (2) days of free Base Rent for each day of delay accruing from the Scheduled Delivery Date to the actual Commencement Date; provided, however, that if such delay is caused by a Force Majeure Event (as defined in Section 23.17 below), the Scheduled Delivery Date shall be deemed extended by a period during which said Force Majeure Event shall cause such delay, but such deferral of the Scheduled Delivery Date shall in no event be deferred by a Force Majeure Event for more than forty-five (45) days. Landlord and Tenant agree that the foregoing sum is their best estimate of the daily damages, including but not limited to lost sales that Tenant will incur as a result of Landlord's failure to deliver the Premises. Tenant's entitlement to any free rent shall be realized subsequent to any rent reduction pursuant to any New Construction Contingencies (as defined in 5.5 below) set forth herein. If the Commencement Date does not occur within ninety (90) days after the Scheduled Delivery Date for any reason whatsoever, Tenant, at its option, may terminate this Lease upon written notice to Landlord. Such termination date shall not be subject to extensions for any reason whatsoever (including, without limitation, Section 23.17). If Tenant elects to terminate this Lease, Landlord shall reimburse Tenant an amount equal to the accrued free Base Rent and for all of Tenant's expenses incurred in connection with this Lease, including, without limitation, site selection, design and lease negotiation costs and expenses (including the allocated cost of in-house personnel). Landlord shall also return all monies previously deposited by Tenant, if any.

4.4     Tenant Allowance. In addition to Landlord's obligations under Sections 4.1 and 4.2 above, Landlord shall provide Tenant with an improvement allowance in the amount of Sixty Thousand and 00/100 Dollars ($60,000.00) and a restroom credit as described in **Exhibit C** in the amount of Thirteen Thousand and 00/100 Dollars ($13,000.00) (collectively, the "Allowance"), for a total of Seventy-Three Thousand and 00/100 Dollars ($73,000.00), which shall be paid in full to Tenant upon Tenant's opening for business in the Premises. The Allowance shall not be reduced by costs incurred by Landlord in constructing the Premises or the Shopping Center and can be modified by only an amendment to this Lease that has been duly executed by Landlord and Tenant. Landlord and Tenant agree that the Allowance offsets the cost of the flooring, ceiling, electrical, sewer, and bathrooms that Tenant installs, all of which, upon installation, shall become the property of Landlord and remain in the Premises. If Landlord has not paid Tenant the Allowance within thirty (30) days after Tenant opens for business in the Premises, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount and a

One Hundred and 00/100 Dollar ($100.00) per month administrative fee, against Base Rent and all other charges (at Tenant's discretion) until the Allowance is fully offset.

4.5 _Independent Measurement of Premises_. At any time during the first six (6) months of the Term, Tenant may engage an independent certified architect or surveyor to measure the Gross Leasable Area of the Premises. If the architect's or surveyor's measurement of the Gross Leasable Area of the Premises is less than the Gross Leasable Area of the Premises set forth in Article 1 above by three percent (3%) or more, Base Rent and Tenant's Pro Rata Share (as defined in Section 12.2 below) shall be proportionally reduced. If the variance is less than three percent (3%), Landlord and Tenant shall make no adjustments to this Lease.

4.6 _Landlord's Building Plans_. Tenant has approved Landlord's plans for configuration of the Premises, the Building, the Shopping Center, Tenant's drive-through facility, and the parking area ("Landlord's Plans") prior to Landlord's submission of Landlord's Plans for permitting. Landlord shall obtain its permits for Landlord's Plans on or before April 1, 2008. If Landlord materially changes Landlord's Plans after Tenant approves the same (whether or not the changes are being required by a governing authority), then Landlord shall re-submit Landlord's Plans clearly indicating the changes ("Landlord's New Plans") to Tenant for Tenant's review and approval. Tenant shall either approve Landlord's New Plans or request modifications to Landlord's New Plans. Landlord shall reimburse Tenant for the actual cost for Tenant to redraw its plans for the Premises ("Re-Draw Costs") to correspond with Landlord's New Plans. If Tenant does not approve Landlord's New Plans or if Landlord and Tenant fail to agree on acceptable revisions to Landlord's New Plans, Tenant may terminate this Lease by giving written notice to Landlord. If Tenant does not terminate the Lease and Landlord has not paid Tenant its Re-Draw Costs within thirty (30) days after Tenant opens for business in the Premises, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the Re-Draw Costs are fully offset.

5. **USE**.

5.1 _Use_. Tenant may use and occupy the Premises and drive-through lane for (a) a coffee store or (b) any other lawful retail or restaurant use.

Landlord acknowledges that, except as expressly set forth in this Section, Tenant is entering into this Lease in reliance upon its ability to conduct the use described above without any limitation or restriction by reason of any governmental zoning or use restriction, exclusive provision, contractual restriction or limitation granted to any other party which applies to the Premises or Tenant's use thereof. Landlord acknowledges that Tenant may use the Premises to accept returns of merchandise not purchased from Tenant.

5.2 _Compliance with Law_. During the Term, Tenant, at its expense, shall comply promptly with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises pertaining to (a) the physical condition of any improvements constructed by Tenant in the Premises; and (b) Tenant's specific business operations in the Premises. Tenant shall not be required to make any seismic or structural upgrades, repairs, improvements or alterations to the Premises or the Shopping Center in order to comply with the requirements of this Section. Landlord, at its sole cost and expense, shall comply with all other laws, rules, regulations, and ordinances made by any governmental authority affecting the Premises, areas adjacent to the Premises, the Common Areas, the Shopping Center and/or the Property including, without limitation, all accessibility for the disabled requirements.

5.3 _Operations_. Tenant may operate its business in such manner and at such hours as Tenant considers proper in Tenant's business judgment. It is expressly understood and agreed that Tenant makes no representations or warranties, oral or written, as to the level of gross sales it may generate from the Premises or the number of customers that it will bring to the Shopping Center.

Eaton Road & Esplanade
Chico, CA
3150870.6

5

© 2001 Starbucks Corporation
Revised June 2005
STARBUCKS

5.4    Exclusivity.  Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of (a) whole or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brand-identified brewed coffee or (e) blended beverages including, without limitation, those containing the following: coffee, espresso and/or tea.  Full service, sit-down restaurants with a wait staff and table service serving a complete dinner menu may sell, in conjunction with a sale of a meal, brewed coffee or tea and hot espresso drinks for on-premises consumption only.

5.5    New Construction Contingency.  Notwithstanding anything in this Lease to the contrary (including, without limitation, Article 3), Tenant shall not be obligated to pay Base Rent or any Annual Additional Rent, or be required to open for business in the Premises until such time as: (i) at least sixty percent (60%) of the Gross Leasable Area in the Shopping Center (including Tenant) is occupied and open for business to the public and (ii) the construction of all Common Areas, including (without limitation) all parking areas are substantially complete and all construction equipment and debris have been removed ("New Construction Contingencies"); provided, however, that Tenant may, at its option and in its sole discretion, elect to open for business before such time as all of the foregoing conditions have been satisfied and during the time between such opening and the date that all of the foregoing conditions have been satisfied, Base Rent and Annual Additional Rent shall be reduced by twenty-five percent (25%) of the amounts otherwise due and payable.  Without limiting the foregoing, in the event that the New Construction Contingencies are not satisfied by April 1, 2009, in addition to any other remedy provided by applicable law or this Lease, Tenant, upon ten (10) days written notice, shall be entitled to terminate this Lease in which case, upon demand, Landlord shall reimburse Tenant for its costs (including allocable in-house expenses) incurred in developing, constructing and operating its store in the Premises, including (without limitation) site selection, brokerage, legal, design, construction, permitting and other fees and costs.

## 6.    MAINTENANCE, REPAIRS, AND ALTERATIONS.

6.1    Tenant's Obligations.  Subject to the provisions of Sections 6.2, 6.3, 9, and 15, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises in good order and repair, including maintaining all plumbing, HVAC, electrical and lighting facilities and equipment within the Premises and exclusively serving the Premises, and the store front, doors, and plate glass of the Premises.  At Tenant's request, Landlord shall transfer or assign to Tenant all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises to serve the Premises exclusively, including, without limitation, the warranty for the HVAC system.  Notwithstanding any provision to the contrary, Tenant's obligations under this Section shall not include making (a) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants; (b) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other agreement between Landlord and Tenant; or (c) any structural or seismic repairs, improvements or alterations to the Premises or the Shopping Center.

6.2    Landlord's Obligations.  Except for repairs, maintenance and replacements to the Premises and the Shopping Center for which Tenant is responsible under Section 6.1, Landlord shall maintain, repair and make replacements to the Premises and the Shopping Center (including the Common Areas).  Landlord shall, at its sole cost and expense (subject to Tenant's payment obligations, if any, pursuant to Article 12 below), make the repairs and replacements and perform such work that is necessary to maintain the foregoing Shopping Center in a good and sound condition comparable to other similar buildings/shopping centers in the Chico, California metropolitan area and in accordance with all codes and regulations.  Such repairs, replacements and maintenance shall include (without limitation) (a) the upkeep of the roof, roof membrane and roof systems (gutters, downspouts and the like), foundation, exterior walls, interior structural walls, and all structural components of the Premises and the Shopping Center and (b) the maintenance and repair of all parking areas, sidewalks, landscaping and drainage systems on the Property and all utility systems (including mechanical, electrical, and HVAC systems) and plumbing systems which serve the Shopping Center as a whole and not a particular tenant's premises. Landlord may allocate the cost of such maintenance and repairs equitably among all

tenants, if and to the extent provided in Article 12. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store fronts (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Section). Landlord shall make all repairs under this Section promptly after Landlord learns of the need for such repairs but in any event within thirty (30) days after Tenant notifies Landlord of the need for such repairs. If Landlord fails to make such repairs within thirty (30) days after Tenant's written notice (except when the repairs require more than thirty (30) days for performance and Landlord commences the repair within thirty (30) days and diligently pursues the repair to completion), Tenant may, at its option, undertake such repairs and deduct the cost thereof from the installments of Base Rent and Monthly Estimated Rent next falling due. Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter notice as is practicable under the circumstances, and if Landlord fails to make such repairs immediately after being notified by Tenant, Tenant may immediately undertake such repairs and deduct the cost thereof from the installments of Base Rent and all other charges next falling due.

6.3     Surrender.  Upon the expiration or termination of this Lease, Tenant shall surrender the Premises to Landlord in broom clean condition, except for ordinary wear and tear and damage caused by fire or other casualty, whether or not insured or insurable.

6.4     Landlord's Rights.  If Tenant fails to perform Tenant's obligations under this Article, Landlord may, but shall not be required to, enter upon the Premises, after thirty (30) days prior written notice to Tenant, and put the same in good order, condition and repair, and the reasonable costs thereof shall become due and payable as additional rental to Landlord together with Tenant's next Base Rent installment falling due after Tenant's receipt of an invoice for such costs. Notwithstanding the foregoing, Landlord's rights under this Section shall be subject to Section 23.14.

6.5     Alterations and Additions.

6.5.1     Initial Improvements.  Landlord acknowledges that it is familiar with Tenant's retail operations and that Tenant, at Tenant's cost, may install such fixtures and finishes and other initial tenant improvements consistent with Tenant's then-current trade dress and standards in the Premises as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements").

6.5.2     Subsequent Improvements.  After the installation of the Initial Improvements, Tenant may make such interior non-structural alterations, improvements and additions to the Premises including, without limitation, changing color schemes, installing new countertops, flooring, wall-covering and modifying the layout of the tenant fixtures, as Tenant deems necessary or desirable without obtaining Landlord's consent. Notwithstanding the foregoing, Tenant shall not make any alterations, improvements, additions or repairs in, on, or about the Premises which affect the structure or the mechanical systems of the Shopping Center without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall be deemed to have approved any subsequent improvement proposed by Tenant unless Landlord disapproves of Tenant's proposal in writing within fourteen (14) days of receiving Tenant's proposal and request for consent. Tenant will not make any such alterations, improvements and additions until Tenant has received all applicable permits and approvals required by any applicable governmental agencies. Any such alterations, improvements or additions shall be performed in a skillful and workmanlike manner, consistent with the best practices and standards of the construction industry, and pursued with diligence. Tenant will use reasonable efforts to perform any such alterations, improvements or additions in a manner that will not interfere with the quiet enjoyment of other tenants in the Shopping Center.

6.5.3     Liens.  Before commencing any alterations, additions or improvements using outside contractors, Tenant shall notify Landlord of the expected commencement and completion dates of the work. Tenant shall not permit any mechanics' or materialmen's liens to be levied against the Premises for any labor or material furnished to Tenant or to its agents or contractors; provided, however, that Tenant shall not be required to pay or otherwise satisfy any claims or discharge such liens so long as Tenant, in good faith and at its own expense, contests the same or the validity thereof by appropriate

© 2001 Starbucks Corporation
Revised form 2/2001
STARBUCKS

proceedings and posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof. Landlord may post notices of non-responsibility on the Premises with respect to any such liens.

   6.6   Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings.

       6.6.1   The term "Tenant's Property" shall mean all personal property, furnishings, machinery, trade fixtures, equipment and improvements (trade or otherwise) which Tenant installs in the Premises. Until or upon the termination or expiration of the Term, Tenant may remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall repair any damage to the Premises or the Building caused by such removal, including patching and filling holes. Notwithstanding the foregoing, in no event shall Tenant be entitled pursuant to this Section 6.6.1 to remove, nor shall Tenant be required to remove, any restroom fixtures, flooring, ceilings, walls or utility or electrical components located inside the walls or HVAC systems.

       6.6.2   Any of Tenant's Property not removed from the Premises on the date this Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord.

7.   **INSURANCE; INDEMNITY**.

   7.1   Tenant's Insurance. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises and shall be maintained with an insurance company with an A.M. Best Company ("Best's") rating of at least A- and a Best's financial performance rating of at least VII. Upon Landlord's request, Tenant will provide Landlord access to an Internet website that certifies Tenant's current insurance coverage.

       7.1.1   Liability Insurance. Bodily injury, personal injury and property damage insurance, naming Landlord, as well as Landlord's managing agent upon Landlord's written request, as additional insureds, against liability arising out of Tenant's use, occupancy, or maintenance of the Premises and Tenant's outdoor seating area (if any). Such insurance shall include an "each occurrence" limit of not less than One Million Dollars ($1,000,000) and a general aggregate limit of not less than Two Million Dollars ($2,000,000). Tenant's insurance shall be primary with respect to any claim arising out of events that occur in the Premises.

       7.1.2   Property Insurance. Commercial property form insurance with a special form endorsement providing coverage on a replacement cost basis for Tenant's trade fixtures, equipment and inventory in the Premises. During the Term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate this Lease pursuant to Article 9 hereof. Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's Property and Landlord shall sign all documents which are necessary or appropriate in connection with the settlement of any claim or loss by Tenant. Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Shopping Center.

   7.2   Landlord's Insurance. During the Term of this Lease, Landlord shall obtain and keep in full force and effect, the following insurance from an insurance company with a Best's rating of at least A- and a Best's financial performance rating of at least VII. The insurance required to be carried by Landlord under this Section shall be referred to herein as "Landlord's Insurance." Tenant shall be named as additional insured under Landlord's liability insurance policies. Upon Tenant's request, Landlord will provide Tenant with a copy of the certificate(s) evidencing and premium bill for Landlord's Insurance.

7.2.1  <u>Liability Insurance</u>.  Bodily injury, personal injury and property damage insurance (to include without limitation contractual liability covering Landlord's obligations under Section 7.5) insuring against claims of bodily injury or death, personal injury or property damage arising out of or in connection with (a) Landlord's conduct upon, in or about the Premises; or (b) the use or occupancy of the balance of the Shopping Center, including (without limitation) the Common Areas, if any, with an each occurrence limit of not less than One Million Dollars ($1,000,000) and a general aggregate limit of not less than Two Million Dollars ($2,000,000).  Notwithstanding the foregoing, Landlord's Insurance shall be primary with respect to any claim covered by Section 7.2.1(a) or arising out of events that occur outside the Premises.

7.2.2  <u>Property Insurance</u>.  Special Form commercial property insurance insuring the Shopping Center (excluding any property which Tenant is obligated to insure under Section 7.1), for the amount of the full replacement of its value as such value may exist from time to time.

7.3  <u>Waiver of Subrogation</u>.  Notwithstanding any other provisions of this Lease to the contrary, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease.  Landlord and Tenant shall require their respective insurance companies to include a waiver of subrogation provision in their respective policies in order to implement this Section 7.3.

7.4  <u>Indemnification by Tenant</u>.  Subject to Section 7.3 and provided that Landlord notified Tenant in writing of any such third party claims within a reasonable time after Landlord becomes aware of such claim, Tenant shall defend, protect, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) arising in connection with any and all third party claims arising out of (a) injuries occurring within the Premises; (b) any intentional conduct or negligence of Tenant or Tenant's agents, employees, or contractors; (c) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Tenant herein to be true when made.  This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees.  This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.  Notwithstanding any provision of this Lease to the contrary, the provisions of this Section 7.4 and Tenant's covenants to provide insurance as provided in this Lease shall in no event extend to Landlord's independent liability.

7.5  <u>Indemnification by Landlord</u>.  Subject to Section 7.3 and provided that Tenant notified Landlord in writing of any such third party claims within a reasonable time after Tenant becomes aware of such claim, Landlord shall defend, protect, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Common Areas or any other portion of the Shopping Center outside the Premises; (b) any intentional conduct or negligence of Landlord or Landlord's agents, employees, or independent contractors; (c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Landlord herein to be true when made.  This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees.  This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

Eaton Road & Esplanade
Chico, CA
3150870 6

9

© 2001 Starbucks Corporation
Revised 2003
STARBUCKS

## 8. ENVIRONMENTAL LIABILITY.

8.1     Environmental Law.  The term "Environmental Law" means any federal, state, local law, statute, ordinance, regulation or order and all amendments thereto pertaining to health, industrial hygiene, environmental conditions or Hazardous Substances.

8.2     Hazardous Substance.  The term "Hazardous Substance" shall mean any substance that is actually or allegedly harmful to human life, animal life, or vegetation or any other portion of the environment; toxic substances, wastes, or pollutants; and hazardous or dangerous substances, including any substances defined, listed and/or regulated by any Environmental Law or by common law decision including, without limitation, chlorinated solvents, petroleum products or by-products, asbestos, and polychlorinated biphenyl.

8.3     Landlord's Covenants.  Landlord warrants, represents, covenants and agrees as follows:

8.3.1     To the best of Landlord's knowledge (other than as disclosed in the Environmental Reports (as defined herein)), no Hazardous Substance has been released, discharged or disposed of on, under or about the Premises, the Shopping Center or the Property (or off-site of the Property which might affect the Premises, the Shopping Center or the Property) by any entity or person, or from any source whatsoever.  Without limiting the foregoing, Landlord represents that the following constitutes all information in Landlord's possession or control concerning any release of Hazardous Substances on, under or about the Premises, the Shopping Center or the Property (or off-site of the Premises that might affect the Premises, or off-site of the Property that might affect the Premises or the Shopping Center) including, without limitation, sampling data, environmental studies or reports, environmental site assessments, building surveys, and historical use reviews (collectively, "Environmental Reports"), all of which have been provided to Tenant:  Phase I Environmental Site Assessment, 6/14/28 West Eaton Road, Chico, California prepared by Expedited Environmental Services, Inc. dated November 2007.

8.3.2     Landlord shall require each of its employees, agents, contractors, subcontractors, tenants, subtenants, or any other party over whom Landlord has supervision or control or right of the same to comply with all applicable Environmental Laws.

8.3.3     Without limiting the foregoing and to the best of Landlord's knowledge, other than as disclosed to Tenant in the Environmental Reports, (a) there are no underground storage tanks on the Premises, the Shopping Center or the Property; (b) no underground storage tanks have been removed from the Premises, the Shopping Center or the Property; (c) there is no asbestos or asbestos containing material in or on the Premises or the Shopping Center, and no asbestos or asbestos containing material has been removed from the Premises or the Shopping Center; (d) no facilities involving the manufacture or disposal of any Hazardous Substance or the use or storage of more than five hundred (500) gallons of any Hazardous Substance per year, including, without limitation, gasoline stations, automobile repair facilities, dry cleaners, photo developing laboratories, junkyards, landfills, waste treatment storage, disposal, processing or recycling facilities have been located on or adjacent to the Premises, the Shopping Center or the Property.

8.3.4     Landlord shall give prompt written notice to Tenant of: (a) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Premises or the Shopping Center (or off-site of the Premises that might affect the Premises) or related to any loss or injury that might result from any Hazardous Substance; (b) all claims made or threatened by any third party against Landlord or the Premises, the Shopping Center or the Property relating to any loss or injury resulting from any Hazardous Substance; and (c) Landlord's discovery of any occurrence or condition on the Premises, the Shopping Center or the Property (or off-site of the Premises that might affect the Premises) that could cause the Premises or the Common Areas, if any, or any part of either, to be subject to any restriction on occupancy or use of the Premises under any Environmental Law.

8.3.5    Subject to Tenant's obligations set forth in Section 8.5.1, if any Hazardous Substance is deposited, released, stored, disposed, discovered or present in or on the Premises, the Shopping Center or the Property, Landlord, at Landlord's expense, shall promptly and diligently, to the extent required by any applicable law, including (without limitation) any Environmental Laws, rules, regulations and policies of any governmental entity with jurisdiction over the same, and in compliance with such laws, remove, transport and dispose of such Hazardous Substance.  Landlord shall use its best efforts to minimize direct and indirect impact on Tenant, including its operations in the Premises and effective use of the Common Areas, if any, during all activities related to remediation.  Without limiting the foregoing, prior to the Commencement Date, Landlord shall, at its sole cost and expense, remove all asbestos and asbestos-containing material from the Premises.  If any asbestos or asbestos-containing material is discovered in the Premises during Tenant's inspection of the Premises, construction of its initial or subsequent tenant improvements or at any other time during the Term, then Landlord shall promptly remove the same or cause it to be removed at Landlord's sole cost and expense and if the foregoing delays the construction or installation of Tenant's improvements, then the Rent Commencement Date shall be extended for one (1) day for each day of delay.  In the event that there shall now or in the future exist any Hazardous Substances in, on, under or about the Premises, the Shopping Center or the Property (not caused by Tenant) that materially and adversely affect Tenant's use of or operations from the Premises, access to or visibility of the Premises,  Tenant's construction of its improvements or Tenant's use of the Common Areas (collectively "Interference"), then, (i) in such event, Base Rent and all other charges payable under this Lease shall be equitably abated in proportion to the effect of the Interference on Tenant's operations; (ii) if Tenant, in its sole discretion, decides to cease operating in the Premises, then (a) all Base Rent and all other charges payable under this Lease shall abate until the date on which Tenant is reasonably able to reopen for business from the Premises without any Interference and (b) for each day of closure, Landlord shall pay to Tenant, as liquidated damages and not as a penalty, the sum of  Five Hundred and 00/100 Dollars ($500.00) per diem; (iii) if such Interference occurs prior to the Rent Commencement Date, then the Rent Commencement Date shall be delayed for one (1) day for each day of Interference  (notwithstanding anything in Article 3 of this Lease to the contrary); and (iv) if such Interference continues for more than ninety (90) days, Tenant may terminate this Lease, in which event Landlord shall pay to Tenant within twenty (20) days of the date of Tenant's vacation of the Premises an amount equal to the unamortized portion (based on straight-line amortization over the Initial Term) of Tenant's store development costs incurred in connection with the Premises, including (without limitation) attorneys' fees, design fees, consultant fees (whether the foregoing fees are incurred by outside or in-house personnel), permitting fees, site selection costs, and construction costs, plus all other costs and expenses incurred by Tenant in connection with this Lease and the Premises.

8.4    Tenant's Use of any Hazardous Substance.  The only Hazardous Substances Tenant may use in its operations are cleaning solutions and other substances as are customarily used in Tenant's business.  Tenant will manage such use in accordance with the Environmental Laws.

8.5    Indemnities.

8.5.1    Tenant shall protect, defend, indemnify, and hold harmless Landlord and Landlord's employees, agents, parents, and subsidiaries from and against any and all loss, damages, costs, claims, damage, expense, or liability, including, without limitation, attorneys' or other professional fees, and the costs of repairs and improvements necessary to return the Premises to the physical condition existing prior to undertaking any activity related to any Hazardous Substance ("Claims") actually incurred by Landlord directly arising out of or attributable to Tenant's or Tenant's agents, contractors, or employees use, manufacture, storage, release, or disposal of a Hazardous Substance on the Premises or the Shopping Center.  This indemnity shall survive the termination of this Lease.

8.5.2    Landlord shall protect, defend, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any Claims directly or indirectly related to: (a) a violation of or responsibility under Environmental Laws except that if such Claims are directly related to Tenant's, or Tenant's agents, contractors or employees use, manufacture, storage, release or disposal of a Hazardous Substance on

Eaton Road & Esplanade
Chico, CA
3150870.6

11

© 2001 Starbucks Corporation
Revised 9/7/2018
STARBUCKS

the Premises or the Shopping Center; or (b) a breach of any representation, warranty, covenant or agreement contained in this Article. This indemnity shall survive the termination of this Lease.

## 9. DAMAGE OR DESTRUCTION.

9.1 Material Damage. If the Premises or the Shopping Center is damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within one hundred eighty (180) days following the date on which such damage occurs, then Tenant may elect to terminate this Lease effective as of the date of such damage or destruction. Within thirty (30) days after the date of such damage, the parties shall reasonably determine how long the repair and restoration will take. After that determination has been made, Tenant shall have a period of thirty (30) days to terminate this Lease by giving written notice to Landlord.

9.2 Repair After Damage. If Tenant does not give written notice of Tenant's election to terminate as provided in Section 9.1, then Landlord shall, subject to the provisions of this Section, immediately commence and diligently pursue to completion the repair of such damage so that the Premises and the Shopping Center are restored to a condition of similar quality, character and utility for Tenant's purposes, including restoration of all items described on **Exhibit C** existing in the Premises prior to such damage. In the event that there is no **Exhibit C** to this Lease, Landlord shall restore the Premises and the Shopping Center to a condition of similar quality, character and utility for Tenant's purposes existing in the Premises prior to such damage. Notwithstanding anything contained herein to the contrary, if the Premises and the Shopping Center are not repaired and restored within one hundred eighty (180) days from the date of the damage, Tenant may terminate this Lease at any time before Landlord completes the repairs and delivers the restored Premises to Tenant. If Tenant does not so terminate, Landlord shall diligently continue to restore the Premises. In the event of termination, Landlord shall return any prepaid Base Rent and other prepaid amounts to Tenant within thirty (30) days from the date of termination of this Lease.

9.3 Uninsured Damage. If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, either Landlord or Tenant may terminate this Lease by thirty (30) days written notice to the other of its election so to do and this Lease shall be deemed to have terminated as of such date unless the other party agrees in writing to pay for such repairs or restoration.

9.4 Damage During Final Two Years. If any damage or destruction occurs to the Premises during the last two (2) years of the Initial Term or any Extension Term and the cost to repair the damage exceeds Fifty Thousand and 00/100 Dollars ($50,000.00), either Landlord or Tenant may terminate this Lease upon giving the other party thirty (30) days written notice; provided, however, that if Landlord notifies Tenant that it wishes to terminate this Lease, then Tenant may, if it has not already done so, exercise its right to extend the term of this Lease under Section 2.4 whereupon Landlord's election to terminate shall be null and void.

9.5 Abatement of Rent. If Landlord is required to repair or restore the Premises and/or the Shopping Center under any provision of this Article and Tenant's use of the Premises is affected, then until Landlord completes such repair or restoration, Base Rent and Annual Additional Rent shall abate from the date of destruction based on the degree of impact such damage and repairs have on Tenant's operations within the Premises as measured by the proportionate reduction in Tenant's sales volume.

## 10. PROPERTY TAXES.

10.1 Definition of "Real Property Taxes". For purposes of this Lease, the phrase "Real Property Taxes" shall include general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest of Landlord in the Property; provided, however, that assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Property Taxes for any Lease Year. Notwithstanding the foregoing, Real Property Taxes shall not include

Eaton Road & Esplanade
Chico, CA
3150870.6

12

© 2001 Starbucks Corporation
Revised June 2001
STARBUCKS

(a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any gross or net income taxes; (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it; or (d) assessments liened against the Property prior to the Rent Commencement Date.

      10.2   <u>Payment of Real Property Taxes</u>. As of the Rent Commencement Date, Landlord represents and warrants that (a) Landlord has paid in full all currently due Real Property Taxes, (b) Landlord shall pay when due all future Real Property Taxes and (c) the tax parcel number of the Property is set forth on <u>**Exhibit A**</u>. Landlord shall render to Tenant, promptly after the receipt of the tax bill applicable to the Premises for a given period during the Term, a legible copy of such tax bill and a statement showing the amount of Real Property Taxes and indicating in reasonable detail the items included in Real Property Taxes and the computation of Tenant's Pro Rata Share of Real Property Taxes. For each Lease Year during the Term, Tenant shall pay Landlord, as additional rent, Tenant's Pro Rata Share of Real Property Taxes in the manner set forth in Article 12. Subject to making estimated payments pursuant to Article 12, Tenant shall pay Real Property Taxes only as such taxes become due and payable during the Term (as defined in Section 2.1), prorated for any partial assessment period occurring immediately before the Rent Commencement Date and after the Expiration Date. Tenant shall have the right to challenge, at its sole expense, the Real Property Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require. Upon the request of Tenant, and if required to preserve the right to challenge such taxes, Landlord will pay all Real Property Taxes under protest or in such other manner as will preserve the right to challenge such taxes. Tenant may challenge Real Property Taxes if Tenant pays any protested amount to Landlord. Landlord will reimburse Tenant for Tenant's Pro Rata Share of any refund of Real Property Taxes received as a result of any tax contest.

      10.3   <u>Personal Property Taxes</u>. Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to its personal property located in the Premises.

      10.4   <u>Property Tax Protection</u>. Notwithstanding anything contained herein to the contrary, if Landlord sells or transfers the Shopping Center or the Property, or if a change of ownership occurs and as a direct result the Real Property Taxes increase, Tenant shall not be obligated to pay any portion of such increase becoming due more than once every five (5) years during the Term.

**11.**    <u>UTILITIES</u>. Landlord shall pay all utility connection fees (including without limitation all water and sewer connection fees), traffic impact fees and any other extraordinary fees in excess of an aggregate of Two Thousand and 00/100 Dollars ($2,000.00) that are associated with the construction of Tenant's Initial Improvements or use of the Premises. Tenant shall have the right to sufficient utilities and ventilation to support its intended use of the Premises. Without limiting the foregoing, Landlord either (a) represents and warrants that the Shopping Center has sufficient electrical capacity to allow Tenant to draw 400 amps of service to the Premises without adverse impact on other occupants or the need for an upgrade in utility service; or (b) covenants to upgrade the electrical capacity of the Building prior to the Commencement Date, at Landlord's sole cost and expense, to allow Tenant to draw 400 amps of service to the Premises without adverse impact on other occupants. Prior to the Commencement Date, at Landlord's sole cost and expense, Landlord shall install separate meters for gas, electric, water and sewer services at the Premises in such locations which are accessible to Tenant. Landlord shall maintain such meters at Landlord's sole cost and expense during the Term of this Lease. Subsequent to the Commencement Date, Tenant shall pay directly to the applicable utility provider the utility charges for all water, sewer, gas and electricity used by Tenant during the Term. In the event any utility serving the Premises is not separately metered, Landlord shall, at its sole cost and expense, install a sub-meter prior to the Commencement Date, maintain such meters during the Term and read such meters and submit a utility statement to Tenant at least once each calendar quarter. Such statement shall show in reasonable detail the calculation of Tenant's utility charge and shall be accompanied with a copy of Landlord's utility bill for such period. Landlord shall not charge Tenant a rate for any utility in excess of the lesser of the rate Landlord pays the supplier of the service or the rate at which Tenant could purchase the services directly through an available supplier. Tenant shall pay to Landlord a utility charge for any sub-metered utility used by Tenant in the Premises within thirty (30) days after receipt of the documents described above. Landlord shall be deemed to have waived its right to payment for any utility charge unless such

Eaton Road & Esplanade
Chico, CA
3150870.6

13

© 2001 Starbucks Corporation
Revised 0/14 2001
STARBUCKS

charge has been submitted to Tenant within twelve (12) months of the date of Landlord receives such bill or charge from the utility provider. Landlord acknowledges that Tenant has the right to contract with and use its own energy service providers and until it does so Landlord may use its own energy service providers to serve the Premises.

## 12. TENANT'S PRO RATA SHARE OF COMMON AREA OPERATING EXPENSES, INSURANCE AND TAXES.

12.1     General Definitions. The term "Operating Expenses" shall mean the reasonable and necessary, out-of-pocket costs and expenses actually paid in any calendar year directly attributable to maintaining, operating, and providing services to and for the Common Areas without duplication, including the costs of utilities, maintenance, supplies and wages, and subject to the exceptions set forth in Section 12.5. If Landlord calculates Operating Expenses on a Lease Year basis, references in this Article to calendar year shall be changed to Lease Year where appropriate. The term "Common Areas" shall mean all portions of the Shopping Center (excluding the Premises and any other space in the Shopping Center designed to be leased to another tenant for its exclusive use) including landscaped areas, parking lots, and sidewalks. The terms "Landlord's Insurance" and "Real Property Taxes" shall have the meanings assigned in Sections 7.2 and 10.1 respectively and shall not be included in Operating Expenses.

12.2     Definition of Tenant's Pro Rata Share. Tenant's Pro Rata Share shall be the ratio of the Gross Leasable Area of the Premises to the Gross Leasable Area in the Shopping Center (Tenant's "Pro Rata Share"). Tenant's Pro Rata Share is estimated to be twenty-four and three-tenths percent (24.3%). Landlord represents that as of the date hereof, the Shopping Center contains approximately seven thousand (7,000) square feet of Gross Leasable Area. If the number of square feet of Gross Leasable Area in the Shopping Center increases during the Term, then Tenant's Pro Rata Share shall be adjusted accordingly. In no event shall Tenant's Pro Rata Share increase.

12.3     Tenant's Payment. Commencing on the Rent Commencement Date, for each calendar year of the Term (prorated for any calendar year falling partially within the Term), Tenant shall pay to Landlord as additional rent Tenant's Pro Rata Share of Operating Expenses, Landlord's Insurance and Real Property Taxes (collectively known as "Annual Additional Rent"). Prior to the Rent Commencement Date and at least thirty (30) days prior to the beginning of each calendar year thereafter, Landlord shall furnish to Tenant a written statement setting forth the following: (a) the amount Landlord estimates Landlord will pay for Operating Expenses (broken down into reasonable categories), Real Property Taxes and Landlord's Insurance for the then upcoming calendar year; (b) Landlord's estimate of Tenant's Annual Additional Rent; and (c) a calculation of one-twelfth (1/12) of Landlord's estimate of Tenant's Annual Additional Rent ("Monthly Estimated Rent"). Landlord's estimates of Tenant's Annual Additional Rent shall be reasonably based on the actual amounts paid by Tenant for such expenses during the previous year. Tenant shall pay to Landlord the Monthly Estimated Rent beginning on the Rent Commencement Date and on the first day of every successive calendar month thereafter during the Term. Monthly Estimated Rent for a period of less than one month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year. Notwithstanding any provision of this Lease, Tenant's Pro Rata Share of Operating Expenses from the Rent Commencement Date through the end of the first full calendar year shall not exceed on an annual basis Two and 55/100 Dollars ($2.55) per square foot of Gross Leasable Area in the Premises, Tenant's Pro Rata Share of Landlord's Insurance from the Rent Commencement Date through the end of the first full calendar year shall not exceed on an annual basis Zero and 74/100 Dollars ($0.74) per square foot of Gross Leasable Area in the Premises, and Tenant's Pro Rata Share of Real Property Taxes from the Rent Commencement Date through the end of the first full calendar year shall not exceed on an annual basis One and 76/100 Dollars ($1.76) per square foot of Gross Leasable Area in the Premises. Notwithstanding anything contained herein to the contrary, the portion of Tenant's Annual Additional Rent attributable to Operating Expenses (excluding, by definition, Real Property Taxes and Landlord's Insurance) for any calendar year shall not exceed one hundred five percent (105%), on a non-cumulative basis, of the portion of Tenant's Annual Additional Rent attributable to Operating Expenses (excluding, by definition, Real Property Taxes and Landlord's Insurance) payable by Tenant for the previous year.

Eaton Road & Esplanade
Chico, CA
3150870.6

14

© 2001 Starbucks Corporation
Revised June 2001
STARBUCKS

12.4    Reconciliation. For each calendar year of the Term, within sixty (60) days after the end of each calendar year, Landlord shall furnish to Tenant, at the notice address provided for in Article 25, a statement in reasonable detail and certified as complete and correct by an authorized representative of Landlord, including supportive documentation, setting forth (a) Landlord's actual costs for Operating Expenses, Real Property Taxes and Landlord's Insurance for that year by category and amount; (b) the amount of Tenant's Annual Additional Rent; and (c) the sum of Tenant's Monthly Estimated Rent payments made during the year. If the amount of Tenant's Annual Additional Rent exceeds the sum of Tenant's Monthly Estimated Rent payments (and a statement has been received during such sixty (60) day period), Tenant shall pay the deficiency to Landlord within forty-five (45) days after Tenant's receipt of such statement, provided that Tenant may suspend payment of any amount which (x) it disputes in good faith, (y) was paid by Landlord in a calendar year other than the year covered by the statement, or (z) it has not been provided with reasonable details as set forth above, until resolution thereof. If the sum of Tenant's Monthly Estimated Rent payments during the year exceeds the amount of Tenant's Annual Additional Rent, Landlord shall pay the excess to Tenant at the time Landlord furnishes the statement, or, if the Term has not expired, may credit the excess toward the payments of Base Rent and Tenant's Monthly Estimated Rent next falling due. Landlord shall be deemed to have waived its right to payment for any amount which is understated or not included in the statement for the year in which the work was performed or the cost was billed to Landlord.

12.5    Exclusions from Operating Expenses. Notwithstanding anything to the contrary contained in this Lease, Operating Expenses shall not include: (a) the initial costs of any item properly chargeable to a capital account using generally accepted accounting principles consistently applied or the original costs of constructing the Shopping Center; (b) the cost of any capital addition, repair or replacement to the Shopping Center or the Property (or reserves therefor), excluding capital improvements made during the ordinary care and maintenance of the Shopping Center or Property, amortized over the maximum useful life in accordance with generally acceptable accounting principles; (c) expenses for which the Landlord is or will be reimbursed by another source (excluding Tenant reimbursement for Operating Expenses), including but not limited to repair or replacement of any item covered by warranty; (d) costs incurred to benefit (or as a result of) a specific tenant or items and services selectively supplied to any specific tenant; (e) expenses for the defense of the Landlord's title to the Property; (f) structural repairs and replacements; (g) depreciation and amortization of the Shopping Center or financing costs, including interest and principal amortization of debts; (h) charitable, lobbying, special interest or political contributions; (i) costs of improving or renovating space for a tenant or space vacated by a tenant; (j) any amounts expended by Landlord to comply with any Environmental Laws; (k) costs to correct original or latent defects in the design, construction or equipment of the Shopping Center; (l) expenses paid directly by any tenant for any reason (such as excessive utility use); (m) any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty or hazard; (n) any expenses incurred (i) to comply with any governmental laws, regulations and rules or any court order, decree or judgment including, without limitation, the Americans with Disabilities Act; or (ii) as a result of Landlord's alleged violation of or failure to comply with any governmental laws, regulations and rules or any court order, decree or judgment; (o) leasing commissions, advertising expenses and other costs incurred in leasing or procuring new tenants; (p) rental on ground leases or other underlying leases; (q) attorneys' fees, accounting fees and expenditures incurred in connection with tax contests or negotiations, disputes and claims of other tenants or occupants of the Shopping Center or with other third parties except as specifically provided in this Lease; (r) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Shopping Center; and (s) amounts billed (directly or indirectly) for salaries, overhead and administrative and/or management fees, office expenses, rent and office supplies which (i) in the aggregate, exceed ten percent (10%) of the Operating Expenses, excluding those described in this subpart (s) of this Section 12.5, (ii) are duplicative; (iii) do not represent actual costs incurred for actual services; or (iv) are administrative and/or management fees related to Common Area utility costs, Landlord's Insurance and/or Real Property Taxes.

12.6    Records. Landlord shall keep records showing all expenditures incurred as Operating Expenses, Landlord's Insurance and Real Property Taxes for each calendar year for a period of three (3) years following each year, and such records shall be made available for inspection and photocopying by Tenant and/or its agents during ordinary business hours in the city in which the Premises are located.

12.7    Dispute Resolution. Any dispute with respect to Landlord's calculations of Tenant's Annual Additional Rent shall be resolved by the parties through consultation in good faith within sixty (60) days after written notice by Tenant to Landlord. However, if the dispute cannot be resolved within such period, the parties shall request an audit of the disputed matter from an independent, certified public accountant selected by both Landlord and Tenant, whose decision shall be based on generally accepted accounting principles and shall be final and binding on the parties. If there is a variance of three percent (3%) or more between said decision and the Landlord's determination of Tenant's Annual Additional Rent, Landlord shall pay the costs of said audit and shall credit any overpayment toward the next Base Rent and/or Monthly Estimated Rent payment falling due or pay such overpayment to Tenant within thirty (30) days. If the variance is less than three percent (3%), Tenant shall pay the cost of said audit.

13.    **ASSIGNMENT AND SUBLETTING**. Tenant shall not assign this Lease and shall not let or sublet the whole or any portion of the Premises without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Tenant may, without Landlord's consent, sublet all or any portion of the Premises or assign this Lease to the following (each, a "Permitted Transfer"): (a) a parent, subsidiary, affiliate, division or other entity controlling, controlled by or under common control with Tenant; (b) a successor entity related to Tenant by merger, consolidation, reorganization or government action; or (c) any entity that engages in a lawful retail or restaurant use, provided that Tenant shall remain liable for the performance of monetary covenants under this Lease. For the purpose of this Lease, any sale or transfer of Tenant's capital stock, redemption or issuance of additional stock of any class shall not be deemed an assignment, subletting or any other transfer of this Lease or the Premises. Landlord shall not be entitled to any consideration in connection with any assignment or sublet. If Landlord's consent is required for an assignment or sublease, then Landlord's consent shall be deemed to have been given unless Landlord notifies Tenant in writing of the reasons for Landlord's disapproval within fourteen (14) days of receipt of the request. Except as set forth above, and unless released in writing, Tenant shall be secondarily liable only for performance of monetary covenants under this Lease following any assignment or sublease other than a Permitted Transfer described in subparts (a) and (b) hereof, in which case Tenant shall remain primarily liable for all covenants under this Lease; provided, however, that Tenant's obligations may not be enlarged or extended by any act or agreement of any assignee or subtenant. The assigning party shall not be liable under this Lease until it receives a copy of the default notice sent to the assignee or subtenant.

14.    **DEFAULTS; REMEDIES**.

14.1    Tenant's Defaults. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

(a)    The failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) business days after Landlord notifies Tenant in writing of such failure; or

(b)    The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

14.2    Remedies in Default. In the event of any such uncured default, Landlord may, in accordance with procedures required by law, pursue one of the following remedies:

(a)    Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall surrender possession of the Premises to Landlord within thirty (30) days after written notice from Landlord to Tenant. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's

Eaton Road & Esplanade
Chico, CA
3150870.6

16

© 2001 Starbucks Corporation
Revised 07/12/2001
STARBUCKS

default including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting (but excluding necessary renovation and alteration of the Premises for use by a subsequent tenant or occupant), and the Base Rent and Annual Additional Rent as it becomes due hereunder; provided that Tenant shall be entitled to a credit against such amounts equal to (i) the amounts received by Landlord by re-leasing the Premises or otherwise mitigating its damages or (ii) if Landlord fails to re-lease the Premises, the fair market rental value of the Premises for the applicable period. If Landlord relets the Premises, then any rent or other concessions given to the new tenant shall be prorated evenly throughout the entire term of the new lease; or

(b)    Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease including the right to recover the Base Rent and Annual Additional Rent as it becomes due hereunder.

Notwithstanding the foregoing, with respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to obtain another tenant for the Premises promptly, at a fair market rental, and to otherwise mitigate its damages.

14.3    Landlord Default and Remedies. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord: (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion); or (b) the failure of any representation or warranty to be true when deemed given hereunder. In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein: (w) to remedy such default or breach and deduct the costs thereof (including attorneys' fees) from the installments of Base Rent and Annual Additional Rent next falling due; (x) to pursue the remedy of specific performance; (y) to seek money damages for loss arising from Landlord's failure to discharge its obligations under this Lease; and (z) to terminate this Lease. Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section be construed to obligate Tenant to perform Landlord's repair obligations.

## 15.    CONDEMNATION.

15.1    Condemnation of Premises. If any portion of the Premises is taken by a government entity exercising the power of eminent domain, or sold to a government entity by Landlord under the exercise of said power (the final judicial order that permits the taking is herein referred to as "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes possession of the condemned portion of the Premises (the "Condemnation Date"). If so much of the Premises is taken, that in Tenant's reasonable business judgment, the Premises are no longer reasonably suitable for Tenant's operations, Tenant may terminate this Lease. If the entire Premises are condemned, then this Lease shall automatically terminate as of the Condemnation Date. The party who receives the condemnor's notice of intention to take (the "Condemnation Notice") shall immediately give a copy of such notice to the other party.

15.2    Condemnation of the Property. If as a result of any condemnation of the Property or any portion thereof (even though the Premises are not physically affected), if either (a) the Premises, the Shopping Center, or Property are no longer reasonably suited for the conduct of Tenant's business in Tenant's reasonable business judgment, (b) the number of parking spaces on the Property located within fifty (50) feet of the Premises is reduced by more than two (2) spaces and Landlord does not provide alternative equally accessible parking, or (c) the drive-through lane configuration and/or dimensions (including any turning radius or stacking lanes) are materially and negatively affected, then Tenant may

Eaton Road & Esplanade
Chico, CA
3150870.6

17

© 2001 Starbucks Corporation
Revised June 2000
STARBUCKS

terminate this Lease at any time after Tenant receives the Condemnation Notice by giving Landlord thirty (30) days written notice.

15.3    Condemnation of the Shopping Center. If a condemnation of any portion of the Shopping Center (even though the Premises are not physically affected) renders the Shopping Center unsuitable for use as a retail building/shopping center in either party's reasonable business judgment, then either Landlord or Tenant may terminate this Lease by giving the other at least thirty (30) days written notice. Notwithstanding the foregoing, Landlord may only exercise its right to terminate under this Section if Landlord terminates the leases of all other tenants in the Shopping Center.

15.4    Restoration. If this Lease is not terminated, (a) it shall remain in full force and effect as to the portion of the Premises remaining, provided the Base Rent and all other charges payable hereunder shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to taking, and (b) Landlord shall use the condemnation award to restore the Premises and the Shopping Center as soon as reasonably possible to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation. Notwithstanding anything contained herein to the contrary, if the restoration of the Premises and/or the Shopping Center is not commenced within thirty (30) days of Landlord's receipt of the condemnation award or is not completed within one hundred eighty (180) days from the Condemnation Date, then Tenant may terminate this Lease at any time before Landlord completes the restoration. If this Lease is terminated, Landlord shall return any deposits, all prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of this Lease.

15.5    Award. Landlord and Tenant may each pursue any condemnation award to which it is entitled by applicable law. Tenant may recover from the condemning authority or from Landlord (if Tenant can show that such amount was included in Landlord's award) that portion of any net award or payment attributable to Tenant's work or installations in the Premises, including without limitation, the unamortized value of improvements installed in the Premises by Tenant at Tenant's expense based on straight-line depreciation over the Initial Term of this Lease without regard to the condemnation. For the purposes of this Section, a "net" award or payment shall mean the entire award or payment for such taking, less the actual and reasonable expenses incurred in collecting such award or payment.

16.    SIGNAGE. Tenant, at its cost, shall have the right to install or place signs, awnings, or other advertising materials in, on or about the Premises or on the Shopping Center, including all directional signs, menu boards, and other signage associated with the drive-through facility, to the maximum extent permitted by law. All exterior signage and awnings shall be in compliance with all applicable laws, regulations and rules. Landlord shall not vary or change the location, size or position of Tenant's signage, including but not limited to the position of Tenant's signage on any pylon or monument signs. Notwithstanding anything contained herein to the contrary, Landlord hereby consents to, and Tenant shall be permitted to install, Tenant's then-current trademarked name(s), colors, letters, font and logo in Tenant's signage as depicted on **Exhibit G**. Notwithstanding anything contained herein to the contrary, Tenant shall not be required to obtain Landlord's consent for any promotional or advertising signs or displays within the interior of the Premises. Landlord shall not allow any signage other than Tenant's to be erected on the exterior walls of the Premises or on the face of the Building within the dimensions of the Premises or on the roof above the Premises. Tenant shall have the right to approve Landlord's program for Tenant's storefront. Tenant shall also have the exclusive right, at no additional rent, to install, maintain and, when necessary, replace signage on the Building's tower element. If colored awnings are planned for the Building, Landlord shall use Starbucks green (Pantone 3425c) or black (Pantone PMS7c) over and around the Premises.

If Landlord implements sign criteria after Tenant executes this Lease (whether or not the changes are being required by a governing authority), then Landlord shall submit Landlord's sign criteria ("Sign Criteria") for Tenant's review and approval (in Tenant's sole and absolute discretion). Tenant shall approve or disapprove Landlord's Sign Criteria or request modifications to Landlord's Sign Criteria. Landlord shall reimburse Tenant for the actual cost for Tenant to remove the old signage and manufacture and install its new signage ("New Sign Costs") to correspond with Landlord's Sign Criteria. If

Tenant does not approve Landlord's Sign Criteria or if Landlord and Tenant fail to agree on acceptable revisions to Landlord's Sign Criteria, Tenant may terminate this Lease by giving written notice to Landlord. If Tenant does not terminate the Lease and Landlord has not paid Tenant its New Sign Costs within thirty (30) days after Tenant installs its new signage, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the New Sign Costs are fully offset.

If Landlord requests that Tenant temporarily remove Tenant's exterior signage after installation for any reason and Tenant consents to such removal in writing, Landlord shall reimburse Tenant for the actual cost incurred by Tenant to remove, store and re-install the exterior signage. If Landlord has not paid Tenant those costs within thirty (30) days after Tenant re-installs its exterior signage, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the Tenant's costs are fully offset.

17.    **PERMIT CONTINGENCY.** Tenant's obligations under this Lease are conditioned on Tenant obtaining any permits and/or licenses (including but not limited to conditional use permits, building permits, variances and other governmental approvals) (collectively, "Government Approvals") that are required by applicable laws to enable Tenant legally (a) to construct Tenant's improvements to the Premises in accordance with Tenant's plans therefor; (b) to install Tenant's signage on the Premises; (c) to conduct its business from the Premises, and (d) to provide and operate outdoor seating for the Premises. Tenant shall, at Tenant's expense, initiate and diligently pursue each Government Approval. Landlord shall execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such Government Approvals. If Tenant does not obtain such Government Approvals on terms satisfactory to Tenant or if any Government Approvals are not renewed or are revoked during the Term of this Lease due to Landlord's conduct, Tenant shall have the right to terminate this Lease. After a termination hereunder, neither party shall have any rights or liabilities under this Lease, and Landlord shall return any deposits and prepaid amounts to Tenant, if any; provided that, if such termination is based on such Landlord conduct, Tenant shall be entitled to pursue such other rights and remedies as may be available at law or in equity. Tenant shall vacate the Premises within thirty (30) days after exercising the option to terminate as herein provided.

18.    **OUTDOOR SEATING AREA AND DRIVE-THROUGH FACILITY.**

18.1    <u>Outdoor Seating Area</u>. If such seating is permitted by the local authorities, Tenant may provide outdoor seating for its customers on property owned by Landlord immediately adjacent to the Premises at any time during the Term of this Lease at no additional rental. The outdoor seating area will contain approximately three hundred (300) square feet as depicted on **Exhibit B**. Tenant, at its cost, shall comply with all relevant state, municipal or local laws, regulations, rules or ordinances applicable to its operations in the outdoor seating, and shall obtain all necessary permits or licenses for the same. Tenant shall take reasonable steps to keep the outdoor seating area exclusively serving its customers reasonably clean and neat.

18.2    <u>Drive-Through Facility</u>. Landlord shall construct the drive-through facility for the Premises in accordance with Landlord's Work requirements, Section 4.2 and **Exhibit C** and in accordance with Tenant's design criteria.

19.    **TENANT'S RIGHT OF EARLY TERMINATION.** Intentionally deleted.

20.    **TENANT'S USE OF COMMON AREAS.** Tenant shall have the right to use any and all appurtenances and easements benefiting the Premises and the Shopping Center and any adjacent or adjoining properties owned by Landlord, along with sufficient Common Areas and parking to support its intended use of the Premises, including such portions as are necessary for Tenant's operation of the drive-through facility, including necessary stacking lanes. In addition to the foregoing, Tenant shall have the right of access to such portions of the Shopping Center outside the Premises as are necessary to enable Tenant to exercise its rights under this Lease. Landlord shall not allow any permanent or

© 2001 Starbucks Corporation
Revised June 2001
STARBUCKS

temporary kiosk, cart, or other obstruction to be constructed or placed on the Property within one hundred fifty (150) feet of the Premises. Any changes, additions or alterations to the Premises, the Property or the Shopping Center shall not (a) impair access to, visibility of or frontage of the Premises; (b) materially affect the conduct of Tenant's customary business therein; or (c) detract from Tenant's signage, create confusion regarding the business conducted in the Premises, or adversely affect the presentation of Tenant's exterior signage and storefront. In the event of any such interference, in addition to Tenant's other rights and remedies under applicable law and this Lease, the Base Rent and Annual Additional Rent shall be equitably abated based on the degree of interference with Tenant's business.

**21. PARKING AND ACCESS.** At no expense to Tenant and/or its employees or customers, Landlord shall provide all necessary parking for Tenant's employees and customers (and Landlord shall apply for and obtain all variances in connection therewith), as needed to meet all code and permitting requirements for Tenant's anticipated use throughout the Term. Landlord shall not vary or permit to be varied the existing means of ingress and egress to the Shopping Center and the Property. Landlord shall not reduce the number of parking spaces below that which is required by law for Tenant to maintain its permit to use and occupy the Premises or realign the parking spaces in a manner that makes them substantially less accessible to the Premises.

**22. TRASH REMOVAL.** Landlord shall arrange with a waste management company to provide adequate trash and recycling services to the tenants of the Shopping Center. If Tenant is required to share trash removal or recycling containers with other tenants, such shared containers shall be adequately sized and serviced to handle Tenant's trash and recycling requirements. Furthermore, any trash or recycling container opening shall have a maximum height of three feet (3') from ground level. If the container opening is higher than three feet (3') from ground level, an appropriate step shall be provided by Landlord so that the container opening is three feet (3') or less from the top of the step. Where available, container lids shall be comprised of plastic or rubber. Landlord shall pay the costs of such trash removal and recycling services (including usage of such containers) directly to the company providing such service. Landlord shall submit an invoice to Tenant for such trash and recycling services at least once each calendar quarter. Such invoice shall show in reasonable detail the calculation of Tenant's share of trash and recycling charges and shall be accompanied with a copy of Landlord's bill for such period. Landlord shall not charge Tenant a rate for any trash and recycling services in excess of the lesser of the rate Landlord pays the supplier of the service or the rate at which Tenant could purchase the services directly through an available supplier. Tenant shall pay to Landlord its share of trash and recycling service charges within thirty (30) days after receipt of the documents described above. Tenant's share of the costs of such trash and recycling service shall be based on the Gross Leasable Area of the Premises compared to the total Gross Leasable Area of all tenants sharing the services, and shall be deemed additional rent. Landlord shall be deemed to have waived its right to payment for any trash and recycling charge unless such invoice has been submitted to Tenant within twelve (12) months of the date of Landlord receives such invoice from the service provider.

**23. GENERAL PROVISIONS.**

23.1    Estoppel Certificate. Tenant shall, no more than twice in any Lease Year and upon not less than thirty (30) days prior written notice from Landlord, execute, acknowledge and deliver to any prospective purchaser or mortgagee, or to Landlord on such party's behalf a statement in writing on Tenant's standard form or on such other form as is acceptable to Tenant, (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect); (b) stating the date to which the Base Rent and other charges are paid and the amount of any security deposit held by Landlord, if any; and (c) acknowledging that there are not, to the actual knowledge of the person executing such certificate, any uncured defaults on the part of Landlord hereunder, or specifying such defaults, if any, which are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord. Tenant will execute additional estoppel certificates upon receipt of an administrative fee of Two Hundred Fifty and 00/100 Dollars ($250.00) per additional estoppel certificate.

Eaton Road & Esplanade
Chico, CA
3150870.6

20

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

23.2    Landlord's Interests.  Landlord represents and warrants to Tenant that as of the Commencement Date, (a) Landlord owns and holds fee title in and to the Shopping Center, the Premises and the Property enabling Landlord to enter into an enforceable lease with Tenant on the terms and conditions contained herein; (b) the real property identified on **Exhibit A** contains the Premises described in Article 1; (c) there are no encumbrances, liens, agreements, covenants in effect that would limit Tenant's rights or augment Tenant's obligations hereunder;  and Landlord further represents and warrants that it will not enter into any such encumbrances, liens, agreements or covenants that do so; (d) Landlord is unaware of any impending condemnation plans, proposed assessments or other adverse conditions relating to the Property.  Landlord will indemnify and hold Tenant harmless if any of the foregoing representations and warranties prove to be untrue.  The term "Landlord" as used herein shall mean only the owner or owners, at the time in question, of the fee title (or a tenant's interest in a ground lease) of the Premises.  In the event of an assignment or transfer of this Lease by Landlord for other than security purposes, Landlord shall cause its assignee or transferee to assume the provisions of this Lease and deliver a new notice address to Tenant and Landlord shall deliver written notice of such assignment or transfer and a copy of the effective instrument of transfer to Tenant within fifteen (15) days after the date of transfer.  Tenant shall be entitled to continue to pay rent and give all notices to Landlord until Tenant has received the foregoing from Landlord and notice information from Landlord's transferee.  Landlord shall deliver all funds in which Tenant has an interest, including but not limited to Tenant's security deposit, if any, to Landlord's purchaser or assignee.  From and after a sale of the Premises or the Shopping Center, Landlord shall be released from all liability toward Tenant arising from this Lease because of any act, occurrence or omission of Landlord's successors occurring after the transfer of Landlord's interest in this Lease, provided Landlord's purchaser or assignee expressly assumes Landlord's duties and covenants under this Lease.  Nothing herein shall be deemed to relieve Landlord of any liability for its acts, omissions or obligations occurring or accruing up to and including the date of such transfer.

23.3    Authority.  Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

23.4    Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

23.5    Time of Essence.  Time is of the essence to the parties executing this Lease.

23.6    Interpretation.  Article and section headings are not a part hereof and shall not be used to interpret the meaning of this Lease.  This Lease shall be interpreted in accordance with the fair meaning of its words and both parties certify they either have been or have had the opportunity to be represented by their own counsel and that they are familiar with the provisions of this Lease, which provisions have been fully negotiated, and agree that the provisions hereof are not to be construed either for or against either party as the drafting party.

23.7    Incorporation of Prior Agreements; Amendments.  This Lease contains all agreements of the parties as of the date hereof with respect to any matter mentioned herein.  No prior agreement, correspondence or understanding pertaining to any such matter shall be effective to interpret or modify the terms hereof.  This Lease may be modified only in writing, signed by the parties in interest, at the time of the modification.  Landlord specifically acknowledges that Tenant's employees at the Premises do not have authority to modify this Lease or to waive Tenant's rights hereunder.

23.8    Waivers.  No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord of the same or any other provision.  A party's consent to or approval of any act shall not be deemed to render unnecessary obtaining such party's consent to or approval of any subsequent act.  No waiver shall be effective unless it is in writing, executed on behalf of Landlord or Tenant by the person to whom notices are to be addressed.

Eaton Road & Esplanade
Chico, CA
3150870.6

21

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

23.9 Recording. Landlord or Tenant may record a short form or memorandum of lease at its own expense. At Tenant's request, the parties shall execute a memorandum of lease in recordable form giving notice of such nonmonetary terms as Tenant may reasonably request, including Tenant's exclusivity and option rights. If Tenant exercises such option, upon termination or expiration of this Lease, Tenant shall, at its sole expense, remove such recorded memorandum from title records.

23.10 Holding Over. If Tenant remains in possession of the Premises or any part thereof after the expiration of the Term, with or without the consent of Landlord, such occupancy shall be a tenancy from month-to-month at a rental in the amount of the Base Rent payable in the last month of the Term, plus all other charges payable hereunder, and upon the terms hereof applicable to month-to-month tenancies.

23.11 Cumulative Remedies. Except where otherwise expressly provided in this Lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

23.12 Binding Effect; Choice of Law. The Lease shall be binding upon and benefit the parties, their personal representatives, successors and assigns. The Lease shall be governed by the laws of the state where the Premises are located.

23.13 Subordination, Nondisturbance and Attornment. This Lease shall be subordinate to all existing and future mortgages and/or deeds of trust on the Premises, the Shopping Center or the Property, and Tenant agrees to subordinate this Lease to any future mortgage or deed of trust and to attorn to Landlord's successor following any foreclosure, sale or transfer in lieu thereof; provided that the mortgagee, transferee, purchaser, lessor or beneficiary ("Landlord's Successor") agrees in a written instrument in form and substance satisfactory to Tenant that Tenant's use or possession of the Premises shall not be disturbed, nor shall its obligations be enlarged or its rights be abridged hereunder by reason of any such transaction. Notwithstanding any foreclosure or sale under any mortgage or deed of trust (or transfer by deed in lieu thereof), this Lease shall remain in full force and effect.

23.14 Landlord's Access. Landlord and Landlord's agents shall have the right to enter the Premises upon forty-eight (48) hours prior written notice for the purpose of inspecting the same, showing the same to prospective purchasers or lenders, and making such alterations, repairs, improvements or additions to the Premises or to the Shopping Center as Landlord deems necessary or desirable. Notwithstanding the foregoing, in the event of an emergency requiring Landlord's entry into the Premises, Landlord may give Tenant shorter notice in any manner that is practicable under the circumstances. Landlord may, at any time, place on or about the Premises an ordinary "For Sale" sign, and Landlord may at any time during the last sixty (60) days of the Term, place on or about the Premises an ordinary "For Lease" sign. Any such sign shall be no larger than two feet by two feet (2' x 2'). When entering or performing any repair or other work in the Premises, Landlord, its agents, employees and/or contractors (a) shall identify themselves to Tenant's personnel immediately upon entering the Premises, and (b) shall not, in any way, materially or unreasonably affect, interrupt or interfere with Tenant's use, business or operations on the Premises or obstruct the visibility of or access to the Premises. In the event of substantial, material or unreasonable interference, the Base Rent and Annual Additional Rent all shall be equitably abated if the interference continues for more than twenty four (24) hours. In the event such interference shall continue for longer than six (6) months, Tenant shall have the option to terminate this Lease or continue to operate with rent abatement after such interruption has ceased for a time period equal to the time period of such interruption.

23.15 Only Landlord/Tenant Relationship. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant. Landlord and Tenant expressly agree that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

Eaton Road & Esplanade
Chico, CA
3150870.6

22

© 2001 Starbucks Corporation
Revised June 2001
STARBUCKS

23.16　Attorney's Fees. If either party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, proceeding, trial or appeal, shall be entitled to its reasonable attorneys' fees to be paid by the losing party as fixed by the court.

23.17　Force Majeure. In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party (a "Required Act"), and such delay or hindrance is due to causes entirely beyond its control such as riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty or acts of God ( a "Force Majeure Event"), then the performance of such Required Act shall be excused for the period of delay, and the time period for performance of the Required Act shall be extended by the same number of days in the period of delay. For purposes of this Lease, the financial inability of Landlord or Tenant to perform any Required Act, including (without limitation) failure to obtain adequate or other financing, shall not be deemed to constitute a Force Majeure Event. A Force Majeure Event shall not be deemed to commence until the ten (10) days before the date on which the party who asserts some right, defense or remedy arising from or based upon such Force Majeure Event gives written notice thereof to the other party hereto. If abnormal adverse weather conditions are the basis for a claim for an extension of time due to a Force Majeure Event, the written notice shall be accompanied by data substantiating (i) that the weather conditions were abnormal for the time and could not have been reasonably anticipated and (ii) that the weather conditions complained of had a significant adverse effect on the performance of a Required Act. To establish the extent of any delay to the performance of a Required Act due to abnormal adverse weather, a comparison will be made of the weather for the time of performance of the Required Act with the average of the preceding ten (10) years climatic range based on the National Weather Service statistics for the nearest weather reporting station to the Premises. No extension of time for or excuse for a delay in the performance of a Required Act will be granted for rain, snow, wind, cold temperatures, flood or other natural phenomena of normal intensity for the locality where the Premises are located.

23.18　Confidentiality of Lease. From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Premises (including, without limitation, architectural plans, specifications, site plans and drawings) or Tenant's business, to any person including, without limitation, any brokers, any other tenants in the Shopping Center or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants, current or potential mortgagees, lenders or purchasers of the Property who agree to be bound by the terms of this Section and Tenant may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants and current or potential lenders, assigns or subtenants who agree to be so bound.

23.19　Brokers. Landlord agrees to pay a brokerage commission to Terranomics Retail Services for services provided in connection with this Lease in accordance with the terms of a separate commission agreement. Except as specifically identified in this Section, Landlord and Tenant each represent to the other that they have not dealt, directly or indirectly, in connection with the leasing of the Premises, with any other broker or person entitled to claim a commission or leasing fees. In no event may this Lease be construed to create any express or implied obligation on the part of Tenant to perform this Lease on behalf of any broker (or any person claiming a commission or leasing fee) as primary obligee or as a third party beneficiary. Landlord and Tenant each shall indemnify and hold each other harmless from any loss, liability, damage, or expense (including without limitation reasonable attorneys'

Eaton Road & Esplanade
Chico, CA
3150870.6

23

© 2001 Starbucks Corporation
Revised Draft 2001
STARBUCKS

fees) arising from any claim for a commission or leasing fee arising out of this transaction made by any unidentified broker or other person with whom such party has dealt.

23.20 <u>Consents</u>. Whenever the right of approval or consent is given to a party pursuant to this Lease, that party shall not unreasonably withhold, condition or delay its consent unless this Lease expressly provides otherwise.

23.21 <u>Waiver of Jury Trial</u>. With respect to any litigation arising out of or in connection with this Lease, Landlord and Tenant hereby expressly waive the right to a trial by jury.

23.22 <u>Other Stores</u>. Notwithstanding anything in this Lease to the contrary, under no circumstances do the parties to this Lease intend to limit or otherwise affect in any way the ability or right of Tenant and Tenant's affiliates to open, operate, merchandise or close any stores anywhere, regardless of the proximity to the Premises or the potential or actual affect of the opening, operation, merchandising or closing of such stores, and further regardless of any obligations or rights based on the sales generated at the Premises expressly set forth in this Lease. Without limiting the generality of the foregoing, the parties confirm that neither Tenant nor its affiliates are subject to a so-called "continuous operation clause", "operating covenant", "radius restriction" or similar limitation in favor of Landlord or its affiliates.

24. **QUIET ENJOYMENT**. Without limiting any rights Tenant may have by statute or common law, Landlord covenants and agrees that, so long as this Lease is in full force and effect, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without disturbance by Landlord or by any person having title paramount to Landlord's title or by any person claiming through or under Landlord.

25. **NOTICES**. Whenever a provision is made under this Lease for any demand, notice or declaration of any kind (even if the provision does not expressly require notice in writing), or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and served either personally or sent by United States mail, certified, postage prepaid, or by pre-paid nationally recognized overnight courier service, addressed at the addresses set forth below or at such address as either party may advise the other from time to time. Any such notice, demand or declaration which does not comply with the foregoing requirements above shall be ineffective for purposes of this Lease.

| | |
|---|---|
| To Landlord at: | Rakesh and Pranika Joshi<br>15 Osprey Circle<br>Chico, CA 95928 |
| To Tenant at: | Starbucks Corporation<br>Attn: Property Management Department<br>RE: Starbucks Coffee Company Store #_____-___<br>Mailstop S-RE3 |
| by mail at: | P.O. Box 34067<br>Seattle, WA 98124-1067 |
| or by overnight delivery to: | 2401 Utah Avenue South, Suite 800<br>Seattle, WA 98134 |

Notices, demands, or declarations given under this Lease will be deemed to have been given when received or when receipt is refused.

Landlord shall send a duplicate copy of any notice given under Article 14 to the attention of the Law and Corporate Affairs Department at the same address, Mailstop S-LA1.

Eaton Road & Esplanade
Chico, CA
3150870.6

24

© 2001 Starbucks Corporation
Revised June 2001
STARBUCKS

26. **EXHIBITS** The following exhibits are attached to this Lease and by this reference are incorporated herein:

Exhibit A - Legal Description
Exhibit B - Shopping Center Site Plan Identifying Premises, Drive-Through Lane, Parking, Trash
            Locations and Outdoor Seating Area
Exhibit C - Construction Requirements
Exhibit D - Delivery of Possession Letter
Exhibit E - Landlord Work Modification Letter
Exhibit F - Date Certificate
Exhibit G - Tenant's Signage

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:

Rakesh Joshi, an individual

Prahika Joshi, an individual

TENANT:

STARBUCKS CORPORATION,
a Washington corporation

By
Name/ Michael Malanga
Its: Senior Vice President, Store Development

Landlord's Federal Tax Identification
Number: 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

STATE OF )
                     ) ss
COUNTY OF )

On this [illegible] day of February, 2008, before me, the undersigned, a Notary Public in and for the
[illegible] of [illegible] duly commissioned and sworn, personally appeared RAKESH JOSHI, an
individual, to me known as the individual who executed the foregoing instrument and acknowledged the
said instrument to be the free and voluntary act and deed of said individual for the uses and purposes
therein mentioned and on oath stated that he is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above
written.

NOTARY PUBLIC in and for the _____ of
_____ residing at _____
My commission expires _____
Print Name _____

STATE OF _____ )
                            ) ss
COUNTY OF _____ )

On this [illegible] day of February, 2008, before me, the undersigned, a Notary Public in and for the
[illegible] of [illegible] duly commissioned and sworn, personally appeared PRANIKA JOSHI, an
individual, to me known as the individual who executed the foregoing instrument and acknowledged the
said instrument to be the free and voluntary act and deed of said individual for the uses and purposes
therein mentioned and on oath stated that she is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above
written.

NOTARY PUBLIC in and for the _____ of
_____ residing at _____
My commission expires _____
Print Name _____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

File No: ()
APN No:

STATE OF California )SS
COUNTY OF _____ )

On _____ before me, DENISE HALLGREN, Notary Public, Notary Public, personally appeared _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

This area for official notarial seal.

---

## OPTIONAL SECTION
## CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the documents.

[ ] INDIVIDUAL
[ ] CORPORATE OFFICER(S)   TITLE(S)
[ ] PARTNER(S)        [ ] LIMITED        [ ] GENERAL
[ ] ATTORNEY-IN-FACT
[ ] TRUSTEE(S)
[ ] GUARDIAN/CONSERVATOR
[ ] OTHER

SIGNER IS REPRESENTING:

Name of Person or Entity                    Name of Person or Entity

---

## OPTIONAL SECTION

Though the data requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

TITLE OR TYPE OF DOCUMENT: _____

NUMBER OF PAGES _____ DATE OF DOCUMENT _____

SIGNER(S) OTHER THAN NAMED ABOVE _____

STATE OF WASHINGTON

) ss

COUNTY OF KING

On this 26Th day of February, 2008, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared Michael Malanga, to me known to be the Senior Vice President of STARBUCKS CORPORATION, a Washington corporation, the corporation that executed the foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year this certificate above written.

NOTARY PUBLIC in and for the State
of Washington, residing at _Seattle, WA_
Commission expires _3. 29, 2011_
Print Name: _Kevin D. Corn_

KEVIN D. CORN
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION
MARCH 29

©2007 Starbucks Corporation
Revised June 2006

**EXHIBIT A**

**LEGAL DESCRIPTION**

Tax Parcel Number: 006-690-020-000

That certain tract of land situated in the County of Butte, State of California and more particularly described on the following page.

Eaton Road & Esplanade
Chico, CA
3150870.6

© 2001 Starbucks Corporation
Revised 03/13/2001
STARBUCKS

Description

The land referred to herein is situated in the State of California, County of Butte, City of Chico, and is described as follows:

PARCEL I:

PARCEL 2, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON NOVEMBER 7, 1980, IN BOOK 79 OF MAPS, AT PAGE(S) 71 AND 72.

APN 006-690-020-000

A-2

STARBUCKS

## EXHIBIT B

<u>SHOPPING CENTER SITE PLAN IDENTIFYING PREMISES, DRIVE THROUGH LANE, PARKING,
TRASH LOCATIONS AND OUTDOOR SEATING AREA</u>

See attached.

Eaton Road & Esplanade
Chico, CA
3150870.6

B-1

© 2001 Starbucks Corporation
Revised 5/Time 2001
STARBUCKS



VICINITY MAP
N.T.S.

SITE PLAN

EATON ROAD

Parking Requirement
1800 / 300 = 6 REQ'D SPACES

1" = 40'-0"

NOTE: BUILDINGS AND PARKINGS ARE SHOWN AS PER APPROVED PLANS,
PERMIT #06-02134 (BLDG. B) & #06-02176 (BLDG. C).

CONDITIONAL USE PERMIT FOR:
DRIVE-THRU AT BLDG. B.

APPLICANT: RAKESH JOSHI
14 K EATON ROAD
CHICO CA 95973

THE ESPLANADE

B-2

1/2

STARBUCKS

**EXHIBIT C**

<u>CONSTRUCTION REQUIREMENTS</u>

See attached.

Eaton Road & Esplanade
Chico, CA
3150870.6

C-1

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

# LANDLORD WORKLETTER

## EXHIBIT C-1
## CONSTRUCTION REQUIREMENTS
## AND STANDARDS

PROJECT NAME:      Eaton at Esplanade, Chico

1.    Landlord Construction

Landlord's Work to be completed prior to delivering possession of the Premises to the Tenant and in compliance with standard construction practices and all applicable codes.

Landlord will provide the Tenant with a copy of Landlord's construction schedule, including the name, phone number and address of Landlord's contractor and project manager. The construction schedule must be furnished to the Tenant at least ninety (90) days prior to the Scheduled Delivery Date. The construction schedule must include key completion milestones including completion of access/egress, completion of Tenant parking field, installation of permanent utility services, Building/Shopping Center Certificate of Occupancy, and completion date for Landlord's Work as described herein.

Landlord shall provide Tenant with a weekly construction status report with digital progress photos. Tenant's project manager, or its designated representative, may enter upon the Premises during construction of Landlord's Work to inspect progress, take progress photos, and to determine if Landlord's Work is being completed in accordance with Tenant's standards and construction documents. Upon the completion of the Landlord's Work, the Tenant shall inspect for compliance to the Lease.

2.    Tenant's Completion of Landlord's Work

Landlord's Work shall be completed in accordance with the Lease and Landlord's construction schedule. Tenant shall retain the option to complete Landlord's Work at Landlord's sole expense in the event the Landlord's Work is not completed in accordance with the Lease and Landlord's construction schedule.

3.    Parties Obligations upon Delivery and Possession

Upon delivery of possession of the Premises to Tenant, Tenant shall inspect the Premises to determine whether Landlord's Work has been completed. At this time, Landlord and Tenant shall execute the delivery of possession form in accordance with the Lease.

STARBUCKS

At the time of Tenant's inspection, Landlord shall demonstrate all of Landlord's Work including all mechanical systems of the Premises. Tenant shall deliver to Landlord a written punch list of all incomplete or faulty items of construction or mechanical installation, and any necessary mechanical adjustments and finish work needed to bring the Premises into the condition required by the description of Landlord's Work and the Lease. Landlord shall repair all punch list items prior to Tenant's acceptance of the Premises, or if Tenant chooses to accept delivery of the Premises prior to completion, within thirty (30) days of the date Tenant accepts the Premises.

If the Premises and the Building/Shopping Center are not in the condition required by the description of Landlord's Work and the Lease on the delivery date described in the Lease (or if the Lease is silent, the delivery date Landlord communicated to Tenant in Landlord's construction schedule delivered to Tenant as defined above) then Tenant may, at its option, either (a) delay acceptance of possession until the Premises and the Building/Shopping Center are in the condition required by the Lease and pursue its remedies in the Lease for Landlord's failure to deliver on time; (b) accept possession of the Premises and complete all outstanding Landlord's Work necessary to bring the Premises into the required condition; or (c) enter the Premises to begin performing Tenant's improvements in accordance with the Lease without accepting possession of the Premises. If Tenant elects to proceed under the foregoing subsection (b), then Landlord shall reimburse Tenant for the actual cost of such work, plus an administrative surcharge of fifteen percent (15%) to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums. Tenant's and its contractor's determination of the cost of such work shall be final and binding on Landlord and Landlord acknowledges that Landlord can control the cost by performing Landlord's Work in a timely manner. If Landlord does not reimburse Tenant as required by this Section, then Tenant may offset any such sum against Rent and all other charges due Landlord until such sum has been fully recouped. If Tenant elects to proceed under the foregoing subsection (c) and if the Landlord's Work is not completed within fourteen (14) days after commencement of Tenant's improvements, then Tenant reserves the right to complete the outstanding Landlord's Work as described under subsection (b).

**EXHIBIT C-2**
**Description of Landlord Work**
**New and/or Existing Construction**

| CSI # | Scope Category | Detail |
|-------|----------------|--------|
| 01321 | Landlord Work | • Landlord shall provide Tenant with a weekly construction status report including weekly digital progress photos. |
| 02200 | Selective Demolition | • Demolish, remove and legally discard of all prior tenant's improvements including, but not limited to hazardous substances, partitions, ceilings, floor |

*C-3*

STARBUCKS

| | | |
|---|---|---|
| | | coverings (including adhesive and grout), electrical conduit, plumbing, mechanical ductwork and other fixtures and equipment. Tenant reserves the right to identify real and personal property items to remain prior to demolition. <br>• Space shall be left in "broom clean" condition. |
| 02500 | Utility Service | • Furnish Tenant specified electrical, gas, water and sanitary service to Premises. <br>• Distribute all under slab utilities (electrical, water, gas, and sanitary sewer waste, drains, and venting) to the final points of connection in accordance with Tenant's construction documents. Work to include all saw cutting, trenching, backfill, and concrete to restore floor assembly to match adjacent surfaces. |
| 02510 | Water Distribution | • Furnish and install one domestic water [DW] service sized per local code (minimum 1 _"), and 1 _" meter independently designated for Tenant's use, stubbed via copper piping into the Premises, in accordance with Tenant construction documents. The DW service must be capable of providing a minimum operating flow rate of 50 gallons per minute [gpm]; at a minimum operating pressure of 50 psig and a maximum of 80 psig dynamic pressure. If flow rate or pressure is not sufficient, Landlord shall engineer, furnish and install a booster pump in a location agreed upon with the Tenant. <br>• All under slab water distribution lines are required to be distributed per Tenant's construction documents and per local code. <br>• Furnish and install an approved, tested and certified backflow prevention assembly, if required by applicable codes, in a location identified on Tenant's construction documents. Landlord shall select backflow prevention assembly with a maximum water pressure drop of 15 psig at 50 gpm. <br>• The fire protection system and domestic water system may not be supplied from the same service. |
| 02530 | Sanitary Sewer | • Provide a min. 4" sanitary sewer waste line to the Premises dedicated to Tenant's use. The invert elevation at the furthest point of connection shall be 24" below finished floor (ff) and maintain a minimum slope of _" per lineal foot and shall be per local code. <br>• Distribute all under slab sanitary sewer waste branch lines and venting per Tenant's construction documents and per local code. <br>• Septic tanks or similar drainage systems are not acceptable. |
| | Restroom Credit | • In lieu of constructing two ADA compliant restrooms, Landlord will provide Tenant with a credit of $13,000 which is in addition to the Tenant Improvement Allowance. |

Initials _____     Tenant Initials _____

C-4

STARBUCKS

| CSI # | Scope Category | Detail |
|---|---|---|
| 02550 | Gas Distribution | • Deliver gas service, per applicable local codes, to a location five (5) feet inside of the Premises. Piping size shall be based on pressure distribution and local availability and shall be coordinated with Tenant's MEP Consultant. This scope of work must include, local utility approved, piping manifold sized and ready to receive utility gas meter. |
| 02580 | Site Electrical Distribution | • Furnish and install all conduit, wire, and connections (per the electrical utility requirements and the National Electrical Code) necessary for a complete electrical service installation.<br>• Furnish and install main electrical feeders from utility service point to main panel in Premises and stub up concealed in wall below panel.<br>• Route feeders concealed below grade on site and concealed from public view within space when possible. Electrical switch gear service disconnect and distribution shall be dedicated for Tenant's use only.<br>• Provide a separately metered utility, including the current transformer [CT] block and enclosure, meter base, distribution panel, meter, conduit wiring from the utility service point to Tenant's main electrical panel. Location of the main panel shall be specified by the Tenant. Service drop from the utility company location providing shall be a minimum of 400Amps, 120/208 Volt 3 phase 4 wire power service connected to Tenant's main electrical panel. If only 120/240 Volt (Single Phase or Delta) service is available, advise Tenant immediately and provide a minimum 600 Amp service. Likewise, if Tenant will occupy a single tenant free-standing building, provide a minimum 600 Amp service.<br>• Electrical utilities to be installed using properly sized kva electrical transformer including all electrical meter pans. Furnish and install one 150KVA voltage step down transformer if converting from high voltage to 400 Amps 120/208. Location of transformers shall be per Tenant's construction documents.<br>• Distribute all under slab site electrical distribution lines per Tenant's construction documents and per local code.<br>• Furnish and install electrical conduits from Tenant's electrical panel to all Tenants' pole/monument signs in accordance with Tenant's construction documents. |
| 02775 | Sidewalks & Patios | • Provide a minimum of 300 SF Outdoor Seating Area at a maximum slope of _" per foot. If seating area is adjacent to vehicular traffic, separate the area from traffic by handrail and landscaping. Landlord shall obtain permit for Outdoor Seating if required by applicable code and Outdoor Seating Area shall be ADA compliant.<br>• Provide wheel stops at all parking spaces adjacent to sidewalk or patio. |
| 03300 | Flooring | • Provide level reinforced concrete slab or wood floor at grade street level, in stable, dry condition. Concrete floor must be smooth, level and properly cured and ready to accept Tenant's floor finishes. Wood flooring must be structurally sound.<br>• All flooring must meet applicable dead and live load codes, including but not limited to all applicable building, structural and ADA jurisdictional requirements. The floor structure must have less than 1/64" per foot deflection in order to accept Tenant's floor finishes. |

LL Initials _____     Tenant Initials _____

STARBUCKS

| CSI # | Scope Category | Detail |
|---|---|---|
| 09200 | Gypsum Board | • Provide demised and perimeter walls to level 4 smooth finish from floor to underside of roof deck with 5/8" Type "X" GWB. Furnish insulated demising wall, perimeter wall and roof systems which meet all applicable codes.<br>• Gypsum wall board [GWB] wall assemblies shall be framed with 6" minimum nominal, 20 gauge studs – 16" o.c., insulated (R-19) and GWB. Tenant's wall side shall be provided with 5/8" Type "X" GWB; fire taped and bedded, plumb and square, ready for Tenant wall finishes from floor to underside of roof deck. Seal top and bottom joists, and all penetrations, airtight with properly rated fire stopping material as per applicable codes. If required by local jurisdictions, and if necessary to secure Tenant's certificate of occupancy, the Landlord shall complete the assembly by finishing the opposite side of the wall according to the applicable code. Gypsum board wall system to meet the 1 hr or 2 hr fire rating, per applicable codes.<br>• All CMU walls must be furred-out and finished in accordance with the preceding paragraph. |
| 07500 | Roof | • Provide flashed roof penetrations for Tenant supplied water heater (B vent) and remote roof top condensing units per Tenant's construction documents.<br>• Provide sleepers, curbs and pads to support all roof top equipment per Tenant's construction documents. |
| 08100 | Metal Doors & Frames | • Furnish and install a commercial grade 42" x 84" hollow metal exterior rear service door in compliance with all building and fire agencies having jurisdiction.<br>• Furnish and install all exterior door hardware including door closure, lock set cylinder that houses Falcon core, roton hinge, threshold, weather stripping, door sweep and drip edge as specified by Tenant's construction documents. |
| 08400 | Storefront Doors | • Storefront glazing to be clear (non-tinted), thermal insulated safety rated, and impact resistant to meet all applicable codes.<br>• Provide either (a) all entrances at street or walkway level, or (b) entrances in compliance with all applicable codes that meet federal, state, provincial, and local building, life safety, and handicap accessibility codes.<br>• Provide door hardware per Tenant's construction documents. |
| 13851 | Fire Alarm | • If required by applicable codes for Tenant's use: Permit, furnish and install building monitoring and fire protection alarm system based on Tenant's construction documents. The system shall include audible alarms, visual strobes, duct smoke and heat detectors and pull stations per all applicable codes. Any and all modification to Landlord's base building design as required to coordinate with Tenant's construction documents shall be at the expense of the Landlord and shall be accomplished in accordance with Tenant's opening schedule.<br>• Provide all tie-ins to building smoke detectors, flow switch valve, and duct smoke/heat detectors. The system must be programmed and functional.<br>• Central station monitoring, if required, shall be provided by Landlord.<br>• Provide all coordination, testing and inspections for a fully functional fire alarm system able to obtain Tenant's permanent Certificate of Occupancy and to meet Tenant's opening schedule. |

LL Initials _____      Tenant Initials _____

IS

C-6

STARBUCKS

| CSI # | Scope Category | Detail |
|---|---|---|
| 13900 | Fire Protection | • If required by applicable codes for Tenant's use: Engineer, furnish and install a 4" fire main within Tenant space accessible to Premises via a main line connection, including sprinkler coverage (drops and heads) distributed throughout Premises per Tenant's construction documents and local fire code requirement.<br>• The sprinkler system must include flow and tamper devices, fire alarm system disconnects and back flow prevention as required by agencies having jurisdiction.<br>• System must be pressure tested, fully operational, inspected and approved by local agencies having jurisdiction. |
| 15400 | Plumbing Fixtures & Equipment | • Furnish and install all plumbing vents per Tenant's construction documents, from the roof through flashing to a location above the proposed Tenant ceiling in the Premises.<br>• Keyed, frost-free recessed exterior hose bib per Tenant's construction documents. The hose bib must be connected to _" copper pipe and run 1'0" below roof deck to its termination at min 15" AFF on building exterior. It must be exposed and visible for Tenant's connection.<br>• Furnish and install a grease interceptor/grease trap sized and located per Tenant's construction documents and/or in accordance with jurisdictional water/waste management board. |
| 15500 | HVAC | • Furnish and install HVAC rooftop units (RTU) or split systems, including all electrical connections, plumbing connections, gas connections and thermostats/HVAC controls, per Tenant's construction documents, manufacturer recommendations and all applicable codes.<br>• Furnish no less than one (1) ton mechanical cooling capacity per 125 SF of Tenant's occupied floor space, no single unit larger than 7.5 tons cooling capacity, subject to Tenant's HVAC construction documents. Furnish heating capacity per Tenant's construction documents. HVAC unit shall be tested and operable and a one year manufacturer's warranty shall be supplied/transferred to Tenant.<br>• Landlord shall provide a minimum length of 150 feet of low voltage thermostat cable for the Tenant looped and left in the ceiling space.<br>• HVAC units to be provided with a barometric relief and economizers.<br>• HVAC units with 2000 CFM delivery or greater shall be provided with a duct mounted smoke detector in the return air duct.<br>• HVAC units to receive condensation drain lines to be installed per local code requirements.<br>• Structural support for HVAC system shall meet all applicable codes and include an appropriate structural engineering design and review.<br>• Thermostats/HVAC controls shall comply with Tenant's construction documents and any/all code requirements: minimum one (1) thermostat for each unit with remote sensors to be located according to Tenant's construction documents.<br>• Provide ducted fresh air intake integrated with air handling system per Tenant's construction documents. |

LL Initials _____                                    Tenant Initials _____

| CSI # | Scope Category | Detail |
|---|---|---|
| 15500 | HVAC Continued | • If roof-top units cannot be installed, the landlord shall provide a chilled |

16

C-7

STARBUCKS

| CSI # | Scope Category | Detail |
|---|---|---|
| | | water (CHWS/R) loop and hot water (HWS/R) loop system with water supply and return lines stubbed into the Premises. Chilled and hot water must be supplied 24 hours per day, 365 days per year. Chilled and heated water flow and temperature requirements shall be coordinated with Tenant's MEP consultant. System to include all air handling equipment and VAV boxes per Tenant's construction documents.<br>• Provide energy efficient/code compliance calculations with appropriate permit(s) as required. |
| 15800 | Ductwork | • Furnish and install all rigid "Hard" ductwork per Tenant's construction documents sized at a minimum of 12" in diameter (113 sq. in. cross sectional area) or greater in size; including but not limited to the main HVAC service trunk lines, make up air [MUA] and fresh air intake [FAI]. The Tenant will furnish and install all remaining ductwork and diffusers.<br>• Furnish and install motorized dampers, if required by local jurisdiction and/or any applicable codes.<br>• Furnish and install all restroom exhaust ductwork, curbs and continuously operating exhaust fan (300 CFM minimum combined or 125 CFM per restroom), as defined by Tenant's construction documents. The Landlord will be responsible for all work required to properly seal around any and all penetrations (including but not limited to roof or exterior wall penetrations). |
| 16210 | Electrical Panels | • Furnish and install two (2) each 'Square-D' or equal (with prior approval by Tenant) NEMA PB1, Type 1, 400 A-rated panels with lockable, hinged door-in-door construction. If a 600 Amp service is required per Section 02580, a third 'Square-D' or equal 225A-rated panel will also be required to be furnished and installed. Main panels shall include feed-thru lugs to serve downstream panel. All panels shall be mounted flush with wall, in a location identified by the Tenant.<br>• Each electrical panel shall be furnished with 42 poles and breakers per Tenant's construction documents and panel schedule.<br>• Panels shall have Amps Interrupting Current (AIC) rating sufficient to withstand available fault current at the electrical service entry. |
| 16500 | Lighting | • Furnish and install a security light, a minimum of 150 watt or per local code requirement at exterior rear door at a minimum dimension 10' above finished floor [AFF] and controlled in Tenant's space. |
| 16720 | Telephone System | • Initiate telephone service with LEC (Local Exchange Carrier or telephone service provider).<br>• Provide all necessary pathways from the designated LEC central location to the specific designated location(s) on site.<br>• Provide necessary and compliant space and supporting structures for telephone cable/wire, as required by local and state LEC, tariffs and jurisdiction to ensure timely telephone service connection to the site.<br>• Furnish and install one (1) 2" conduit with pull string from the building's main point of entry [MPOE] to the rear wall of Tenant's space above ceiling. |

LL Initials _____        Tenant Initials _____

| CSI # | Scope Category | Detail |
|---|---|---|
| 02800 | Trash Enclosure | • Provide a 20' w x 12'd x 7' h trash enclosure for Tenant's exclusive use to accommodate for a 4 cubic-yard trash container and a 3 cubic-yard cardboard recycling container as well as recycling totes as available from local municipal trash service provider. The trash enclosure shall be physically located on the property, in a safe and convenient location mutually agreed upon on the site plan, and shall |

17

C-8

STARBUCKS

| CSI # | Scope Category | Detail |
|---|---|---|
| | | comply with all applicable building, zoning and health codes including drainage and both hot and cold water supplied inside. <br> • If Tenant is required to share trash removal or recycling containers with other tenants, such shared containers shall be adequately sized and serviced to handle Tenants' trash and recycling requirements. Trash and recycling containers provided shall comply with all city, county and state waste removal mandates. |
| 02810 | Irrigation Systems | • Furnish and install an irrigation system, which includes a back-flow prevention device and is separately metered. <br> • Furnish and install all site plan improvements per Tenant's site improvement guidelines and standards, and all jurisdictional requirements and applicable codes. This scope of work includes all necessary variances, conditional use permits and/or special exceptions required to obtain drive-thru jurisdictional approvals. |
| 02800 | Site Improvement | • Furnish and install all site plan improvements per Tenant's construction documents and Tenant's site guidelines and standards, and all jurisdictional requirements and applicable codes. <br> • Obtain all necessary variances, conditional use permits and/or special exceptions required by drive-thru jurisdictional approvals. |
| 02900 | Landscaping | • Landlord to provide all landscaping to meet local code and agreed upon by Tenant's representative. |
| | | **DRIVE THRU COMPONENTS** |
| 02580 | DT - Site Electric Distribution | • Furnish and install all underground electrical conduits, labeled with pull strings, from the electrical panels to the following exterior drive-thru equipment as noted on the Tenant's construction documents: <br> 1) One (1) 1" conduit from the menu board to electrical panels. <br> 2) Two (2) 1" conduits from OCS/speaker board to location above ceiling at rear of space. <br> 3) One (1) 1" conduit from all directional signs to electrical panels <br>   (Note: up to 3 directional signs can be served by a single circuit. Additional signs shall be provided with a new dedicated circuit and conduit. <br> 4) One (1) 1" conduit for each two detector loop set to location above ceiling at rear of space. <br> 5) One (1) 1" conduit to pre-order menu board to electrical panels. <br> 6) One (1) 1" conduit to speaker location for power. <br> 7) One (1) 1" conduit from Tenant's dedicated monument/pylon sign to electrical panel. <br> 8) One (1) 1" conduit from height restriction bar if illuminated signage is indicated on plans. |

LL Initials _____  Tenant Initials _____

| CSI # | Scope Category | Detail |
|---|---|---|
| | | **DRIVE THRU COMPONENTS,** *continued* |
| 02580 | DT - Site Electric Distribution | 9) Three (3) spare 1" conduits to be run through foundation wall to front of building. Three (3) spare 1" conduits to be run through foundation wall out rear of building, all conduits to be terminated above ceiling. Verify locations for stub up with Tenant's representative. |
| 02890 | DT - Traffic | Provide parking lot striping and directional arrows per Tenant's |

STARBUCKS

| | Signage | construction documents and per local code. |
|---|---|---|
| 03300 | DT – Site Concrete | • Furnish and install concrete footings and anchor bolts per Tenant's construction documents for the following items: <br> 1) Order menu board <br> 2) Speaker post/OCS <br> 3) Directional signage (minimum 3 per store) <br> 4) Height restriction bar <br> 5) Tenant's dedicated Monument sign/pylon sign <br> 6) Preview menu board <br> • Provide a drive-thru lane constructed of 6" thick stained black, reinforced concrete (6x6 10/10 WWF). The width of the pad shall be the width of the drive-thru lane or no less than 12' wide and the length shall extend from preview menu board to far end of drive thru window bump-out. <br> • Furnish and install 6" diameter steel pipe bollards, filled with concrete, painted and located per Tenant's construction documents. |
| 08500 | DT – Drive-Thru Window | • Furnish and install the Tenant specified drive-thru service window with all connections fully operational per manufacturer's specifications. <br> • Furnish and install 110-volt 15 amp service, transoms and sidelights, including bump out and exterior shelf, per Tenant's construction documents. <br> • Height of service window must be 36" on the inside above finished floor and 42" on the outside measured from drive-thru lane. <br> • Furnish and install air curtain/fly fan at drive thru window per Tenant's construction documents or local code. |
| 10535 | DT – Awnings | • Furnish and install an exterior awning above drive-thru window per Tenant's construction documents. |
| 16500 | DT – Site Lighting | • Furnish and install two (2) exterior, Tenant specified, lights located adjacent to drive-thru window per Tenant's construction documents. <br> Minimum foot candles for exterior lighting around building perimeter shall be a minimum of 1.5 ftc at grade level. |

Landlord: _Rakesh Joshi_    Tenant: _[signature]_

Print Name: _Rakesh Joshi_    Print Name: _Serene Smart_
Title: _Owner_    Title: _Development Manager_
Date: _August 7, 2007_    Date: _8/16/07_

C-10

STARBUCKS

## EXHIBIT D

### DELIVERY OF POSSESSION

Project Name: _____ Store #: _____

Date Possession Tendered: _____

Tenant: Starbucks Corporation

Landlord: _____

Premises Address: _____

Square Footage: _____

Landlord and Tenant acknowledge and agree that:

[ ]    Landlord's Work is complete and accepted by Tenant as of the Possession Date noted above, subject to the terms and conditions of the Lease regarding latent defects and completion of punch list items within fourteen (14) days.

[ ]    Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises as of the Possession Date noted above and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease and the Landlord Work Modification Letter.

[ ]    Tenant does not accept possession of the Premises because the items of Landlord's Work indicated below are not complete. However, Tenant, at its option, may enter the Premises to begin performing Tenant's improvements in accordance with the Lease.

[ ]    Tenant hereby refuses possession of the Premises because the items of Landlord's Work indicated below are not complete.

**Incomplete Items of Landlord's Work:** _____
_____
_____
_____
_____

_____
[Attach additional pages if needed]

From and after the date hereof, all notices should be delivered to Tenant at the address set forth in Article 25 of the Lease.

Landlord:                                    Tenant:

Print Name: _____         Print Name: _____
Title: _____              Title:  Construction Manager
Date: _____               Date: _____

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

**EXHIBIT E**

<u>LANDLORD WORK MODIFICATION LETTER</u>

Project Name: _____ Store # _____

Date: _____ Square Footage: _____

Tenant: Starbucks Corporation          Landlord: _____

Premises Address: _____

The scope of work outlined below will constitute an agreement between the Landlord and Tenant. This agreement allows Tenant to complete the following scope of work for the Landlord with the understanding and agreement that the Landlord will be responsible to reimburse Tenant for the following:

Scope of work to be completed by Starbucks:

(Description) – (item cost)
(Description) – (item cost)
(Description) – (item cost)

Total:

This letter serves as an agreement between Landlord and Tenant. Landlord agrees to pay Tenant the amount of _____ dollars and cents ($_____ ) within thirty (30) days of receipt of invoice, for the completion of Landlord work as noted above.

From and after the date hereof, all notices shall be given to Tenant as required by the Lease.

LANDLORD:                              TENANT:

By:_____          By:_____

Print Name: _____         Print Name: _____

Title:_____         Title:_____

Date:_____          Date:_____

EXHIBIT F

DATE CERTIFICATE

*Date*

Attn: *Name*
*Company Name*
*Address*
*City, State, Zip*

Re:  Starbucks Coffee at _____
     *City, State*
     **Starbucks Store #_____**

Dear *Name*:

Please confirm the following list of dates pursuant to the Lease by and between
_____
and Starbucks Corporation [or Starbucks Coffee Canada, Inc.] for the above referenced location:

|  |  |
|---|---|
| Possession Date: | __/__/___ |
| Permit Date: | __/__/___ [if referenced in the Lease] |
| Commencement Date: | __/__/___ |
| Starbucks Store Opening Date: | __/__/___ |
| Rent Commencement Date: | __/__/___ |
| Expiration Date: | __/__/___ |

Pursuant to Section _____ of the Lease, the Base Rent schedule shall be as set forth below:

| __/__/___ | - | __/__/___ | $_____ | Pro-rated: $_____ ÷ ___ days x __ day(s) |
| __/__/___ | - | __/__/___ | $_____ | Per month |
| __/__/___ | - | __/__/___ | $_____ | Per month |

[If applicable:]

| | | | | | |
|---|---|---|---|---|---|
| **Option1** | __/__/___ | - | __/__/___ | $_____ | Per month |
| **Option2** | __/__/___ | - | __/__/___ | $_____ | Per month |
| **Option3** | __/__/___ | - | __/__/___ | $_____ | Per month |
| **Option4** | __/__/___ | - | __/__/___ | $_____ | Per month |

**Please have both copies of this letter signed and dated by the Landlord and return one (1) of the originals in the envelope provided. If you have any questions regarding the above information please contact *Name* at (*phone number*).**

Agreed to this _____day of _____ *200_*, by and between:

Landlord:                                    Starbucks Corporation:

By: _____     By: _____
        Signature                                      *Name*
                                                        *title*
    _____
        printed name and title

© 2001 Starbucks Corporation
Revised June 2008
STARBUCKS

**EXHIBIT G**

<u>TENANT'S SIGNAGE</u>

© 2001 Starbucks Corporation
Revised June 2006
STARBUCKS

REDACTED
PROPRIETARY INFORMATION

G-2

STARBUCKS

REDACTED
PROPRIETARY INFORMATION

STARBUCKS

REDACTED
PROPRIETARY INFORMATION

STARBUCKS

DRIVE THRU OVAL LAYOUT SPECIFICATIONS

REDACTED
PROPRIETARY INFORMATION

*L-5*

STARBUCKS

REDACTED
PROPRIETARY INFORMATION

C-6

STARBUCKS

REDACTED
PROPRIETARY INFORMATION

6- 7

STARBUCKS

RECORDING REQUESTED BY
MID VALLEY TITLE AND ESCROW CO.
AND WHEN RECORDED MAIL TO:
Rakesh Joshi
Pranika Joshi
15 Osprey Circle
Chico, CA 95928

CHICO

| Recorded | REC FEE | 10.00 |
| Official Records | TAX | 522.50 |
| County Of | | |
| BUTTE | | |
| CANDACE J. GRUBBS | | |
| Recorder | | |
| ROSEMARY DICKSON | | |
| Assistant | Barbara | |
| 09:00AM 07-Sep-2004 | Page 1 of 2 | |

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.: 006-690-020,021        Order No.: 221050DT        Escrow No.: 221050DT

# GRANT DEED

THE UNDERSIGNED GRANTOR(s) DECLARE(s) THAT DOCUMENTARY TRANSFER TAX IS: COUNTY $522.50
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale,
[ ] unincorporated area;  [X] City of Chico

FOR A VALUABLE CONSIDERATION, Receipt of which is hereby acknowledged,

George M. Glende, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY and Gray L. Glende, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

hereby GRANT(S) to
Rakesh Joshi and Pranika Joshi, HUSBAND AND WIFE AS JOINT TENANTS

the following described property in the City of Chico, County of Butte State of California;

SEE LEGAL DESCRIPTION ATTACHED

_____          _____
George M. Glende                          Gray L. Glende

Document Date:  August 30, 2004

STATE OF CALIFORNIA
COUNTY OF  Butte                    )SS
                                     )
On  August 30, 2004         before me, Denise Terriah, Notary
personally appeared George M. Glende and Gray L Glende
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature  Denise Terriah

This area for official notarial seal.

DENISE TERRIAH
Commission # 1449960
Notary Public - California
Butte County
My Comm. Expires Nov 8, 2007

Mail Tax Statements to:   SAME AS ABOVE  or  Address Noted Below

Title

STARBUCKS

Description

The land referred to herein is situated in the State of California, County of Butte, City of Chico, and is described as follows:

PARCEL I:

PARCEL 2, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON NOVEMBER 7, 1980, IN BOOK 79 OF MAPS, AT PAGE(S) 71 AND 72.

APN 006-690-020-000

PARCEL II:

PARCEL 3, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON NOVEMBER 7, 1980, IN BOOK 79 OF MAPS, AT PAGE(S) 71 AND 72.

EXCEPTING THEREFROM THAT PORTION DEEDED TO THE COUNTY OF BUTTE, BY DEED RECORDED SEPTEMBER 23, 1991, INSTRUMENT/FILE NO. 91-39079, OF OFFICIAL RECORDS.

APN 006-690-021-000

STARBUCKS